# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

### *Garland v. Morgan Stanley & Co.*, 2013 IL App (1st) 112121

---

| | |
|---|---|
| Appellate Court Caption | JENNIFER E. GARLAND, Independent Administrator of the Estate of Scott A. Garland, Deceased, Plaintiff-Appellant, v. MORGAN STANLEY AND COMPANY, INC., and DONNA TUREK, Independent Administrator of the Estate of Mark Turek, Deceased, Defendants-Appellees (Sybaris Club International, Inc., *et al.* Defendants). |
| District & No. | First District, Fourth Division<br>Docket Nos. 1-11-2121, 1-11-2199 cons. |
| Filed | September 12, 2013 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | Plaintiff's wrongful death and survival claims, which arose from the crash of a private plane that resulted in the death of her husband, a financial advisor, while returning from a visit with a potential client of one defendant, his employer, were barred by the exclusive remedy provision of the Workers' Compensation Act, notwithstanding plaintiff's contention that the exclusive remedy provision did not apply, where the crash was not accidental and the dual capacity doctrine applied, since plaintiff failed to show anyone acted deliberately with the specific intent to injure her husband, and although plaintiff argued that the pilot, who was her husband's immediate supervisor, was acting in the dual capacity of providing air transportation and working as a financial advisor, his role as the pilot did not generate any obligations unrelated to his roles as an agent of his employer and a co-employee of plaintiff's husband. |
| Decision Under Review | Appeal from the Circuit Court of Cook County, Nos. 06-L-6532, 06-L-1410, 06-L-5121, 08-L-6121, 10-L-4345; the Hon. Irwin J. Solganick, Judge, presiding. |

| | |
|---|---|
| Judgment | Affirmed. |
| | |
| Counsel on Appeal | Richard F. Burke, Jr., of Clifford Law Offices, of Chicago, for appellant. |
| | Michael G. McQuillen, Paula L. Wegman, Austin W. Bartlett, and Nicole L. Simmons, all of Adler Murphy & McQuillen LLP, and Edward J. Matushek III, of Matushek, Nilles & Sinars, LLC, both of Chicago, for appellees. |
| | |
| Panel | JUSTICE FITZGERALD SMITH delivered the judgment of the court, with opinion. |
| | Presiding Justice Howse and Justice Epstein concurred in the judgment and opinion. |

**OPINION**

¶ 1        These consolidated appeals stem from a fatal airplane crash which resulted in the deaths of all four individuals onboard the aircraft. Following the crash, plaintiff Jennifer Garland (plaintiff), the widow and administrator of the estate of decedent Scott Garland (Garland), brought suit against various individuals and entities, alleging wrongful death and survival claims. Relevant to this appeal, plaintiff sought recovery from decedent Garland's employer, Morgan Stanley & Company, Inc. (Morgan Stanley), as well as Garland's co-employee and the estate of the deceased pilot of the aircraft at the time of the accident, Mark Turek (Turek).

¶ 2        Morgan Stanley and Donna Turek, Mark Turek's widow and the administrator of the estate of Mark Turek, sought dismissal of plaintiff's common law tort claims based on the exclusive remedy provision of the Illinois Workers' Compensation Act (the Act) (820 ILCS 305/1 *et seq.* (West 2010)), Morgan Stanley via a motion to dismiss pursuant to section 2-619 of the Code of Civil Procedure (Code) (735 ILCS 5/2-619 (West 2010)), and Turek via a motion for summary judgment pursuant to section 2-1005 of the Code (735 ILCS 5/2-1005 (West 2010)). This cause stems from the trial court's July 7, 2011, orders granting Morgan Stanley's and Turek's dispositive motions.[1]

¶ 3        Plaintiff appeals, contending the trial court erred in dismissing these causes based on the exclusive remedy provision of the Act because: (1) Morgan Stanley and Turek purposefully

_____

[1]Eventually, this court consolidated the plaintiff's appeal from the trial court's order granting Morgan Stanley's motion to dismiss (No. 1-11-2199) with her related appeal from the trial court's order granting Turek's motion for summary judgment (No. 1-11-2121).

endangered Garland; and (2) the dual capacity doctrine precluded such dismissal. Specifically, plaintiff argues that the unique circumstances leading up to the crash brought this cause within a recognized exception to the exclusive remedy provision, including: Morgan Stanley operated a *de facto* air service for its employees; Turek was allowed to transport his co-employees without supervision; Turek was unqualified to make that particular flight; and, unbeknownst to Garland, Turek made that particular flight as a test of his piloting abilities as a precursor to his purchasing a share of the airplane. For the following reasons, we affirm.

¶ 4                                    I. BACKGROUND

¶ 5        On January 30, 2006, Mark Turek, the pilot in command of a Cessna 421B aircraft, and three passengers, Kenneth Knudson, Scott Garland, and Michael Waugh, were en route from a Kansas airport to the Palwaukee Municipal Airport in Wheeling, Illinois, upon return from a business trip to meet with a prospective Morgan Stanley client. As Turek piloted the Cessna 421B for landing, the aircraft crashed, killing all four occupants on board.

¶ 6        Plaintiff's decedent, Garland, and Turek were both financial advisors employed by Morgan Stanley. They were accompanied on the flight by an owner of the plane, Kenneth Knudson, and Michael Waugh, an existing Morgan Stanley customer of Garland. Waugh's father, who resided in Kansas and was not on the aircraft, was the potential Morgan Stanley client they had been visiting in Kansas.

¶ 7        At the time of the accident, Morgan Stanley did not prohibit its employees from flying privately owned airplanes to conduct company business.[2] The record on appeal includes deposition testimony by Bernice Jee, human resources manager at Morgan Stanley in which she testified that, prior to the aircraft crash at issue here, there was no policy regarding the use of private aircraft. Jeffery Adams, Morgan Stanley's representative deponent, also testified that, prior to the aircraft crash at issue here, there was no policy in place at Morgan Stanley regarding the use of private aircraft for business purposes. Adams further testified that he was regional director for the Midwest, defined as Illinois, Wisconsin, Minnesota, Missouri, Indiana, and Ohio, and that, in those states, only 5 financial advisors out of approximately 1,000 in Morgan Stanley's Midwest branches had pilot licenses. Only two of the five pilots identified, Turek and one other employee, flew private aircraft for Morgan Stanley business.

¶ 8        Thomas Ryan testified that, at the time of the aircraft crash, he was the Morgan Stanley complex manager based out of Riverwoods, Illinois, the office at which both Garland and Turek were based. At that time, he had supervisory authority over both Garland and Turek. He testified that the company would reimburse travel expenses for its traveling financial advisers, up to a particular monetary cap. In his opinion, Turek was a "very organized individual" whose biggest hobby was flying his airplane. Although Morgan Stanley did not have a policy prohibiting its employees from using private aircraft for their business trips,

_____

[2]As plaintiff points out, subsequent to this airplane crash, Morgan Stanley instituted a more restrictive private airplane travel policy for its employees.

he did not think Turek had done so very often. Ryan estimated that Turek had flown private aircraft for business purposes on two or three occasions, and had submitted requests for reimbursement of expenses for those prior trips "on a couple of occasions." Ryan had approved those expense requests. He testified there was a comment in Morgan Stanley's policies and procedures handbook which discouraged using private aircraft for business trips. When asked whether Morgan Stanley required its financial advisors who were also pilots to submit proof of flight training and licensure, he responded that it did not, but nor did it require those who would drive while traveling for business to submit proof of possession of a driver's license. He further explained that, while financial advisors occasionally flew private aircraft to their destinations, they could also elect to drive cars or fly commercially.

¶ 9    As we noted in a previous decision regarding this same aircraft crash, Turek was an experienced, licensed private pilot, and specifically qualified to fly multi-engine aircraft:

> "Prior to January 2006, Turek was fully licensed by the Federal Aviation Administration (FAA) to fly twin-engine aircraft, including the accident aircraft. From January 6 through January 9, 2006, Turek completed a flight training course with Recurrent to transition from his Baron B55 twin-engine plane to the Cessna 421B. Previous to taking this course, Turek had 1,284.05 hours of total flight experience, including over 1,050 hours in multi-engine aircraft. Turek had piloted a Cessna 421B aircraft for over 29 hours. At the time he completed the Recurrent course, Turek had been an FAA-licensed pilot for nine years. There is no argument made that Turek was not properly qualified to pilot the subject aircraft under FAA regulations." *Waugh v. Morgan Stanley & Co.*, 2012 IL App (1st) 102653, ¶ 7.

¶ 10    The accident aircraft was owned, operated, and maintained by HK Golden Eagle, Inc., a corporation unrelated to Morgan Stanley. Decedent Knudson and Howard Levinson co-owned HK Golden Eagle. Neither Knudson nor Levinson worked for Morgan Stanley. Knudson had a prospective business customer in Kansas with whom he wanted to meet, and Turek was apparently interested in possibly becoming part owner of the subject aircraft. On January 9, 2006, Turek paid Knudson $20,000 for a "wet lease" of the subject aircraft, meaning fuel coverage and time spent flying the aircraft.

¶ 11    On January 30, 2006, Turek, Garland, Waugh, and Knudson departed Palwaukee airport in Wheeling, Illinois, in the Cessna 421B for Kansas. HK Golden Eagle co-owner Levinson testified in deposition that Knudson would have been watching Turek pilot the aircraft to observe how he handled the controls in flight.

¶ 12    On arrival in Kansas, Turek, Garland, and Waugh met with Waugh's father over lunch to discuss the possibility of the senior Waugh becoming a Morgan Stanley client, and Knudson met with his business acquaintance at a separate lunch meeting.

¶ 13    Following these meetings, the four men departed Kansas for Palwaukee airport. On approach to Palwaukee that evening, the weather was overcast and with a mixture of freezing precipitation that turned to light snow and mist. As it approached Palwaukee airport, the aircraft stalled due to low airspeed and crashed, killing all aboard. The crash occurred at 6:29 p.m.

¶ 14    At the time of the crash, Morgan Stanley maintained worker's compensation insurance

through Liberty Mutual Insurance Company. After the crash, it chose to avail itself of the Act for its employees' work-related injury claims. On January 27, 2009, plaintiff filed an application for adjustment of claim with the Illinois Workers' Compensation Commission, verifying that Scott Garland was fatally injured in the course of his work for Morgan Stanley. Specifically, to the question "How did the accident occur?" plaintiff answered "Injured while working." Additionally, plaintiff testified at her deposition that Scott Garland traveled on business the day of the accident for the purpose of pursuing a potential client on behalf of Morgan Stanley. Plaintiff has not cashed the benefits check she received from Liberty Mutual.[3]

¶ 15     The estates of each decedent filed wrongful death and survival actions, which actions were consolidated for discovery.[4] Relevant to this appeal, plaintiff brought wrongful death and survival claims against Garland's employer, Morgan Stanley, as well as against his co-employee, Turek.

¶ 16     On November 5, 2010, plaintiff filed her ninth amended complaint at law against Morgan Stanley, Donna Turek, and several other defendants. This complaint consisted of 18 counts, 6 counts of which are directed jointly against Morgan Stanley and Donna Turek. These six counts are based upon the alleged liability of Morgan Stanley and Turek under the Illinois Wrongful Death Act (740 ILCS 180/1 (West 2010)) and the Illinois Survival Act (755 ILCS

---

[3]The record on appeal includes an affidavit by Matthew Sekula, the director of complex claims at Liberty Mutual Insurance Company, dated April 2008, in which he attests:

"2. On January 30, 2006, in the course and scope of employment with Morgan Stanley under Liberty Mutual Insurance Workers' Compensation policy *** the Decedent, Scott A. Garland, sustained industrial related death via aircraft crash.

3. Liberty Mutual Insurance thereby assigned Claim file number, 413-826272, under said policy number. As of the date of this affidavit, Liberty Mutual has issued to the beneficiaries of the Decedent $0.00 in medical benefits, and $82,656.00 in indemnity death benefits.

4. To date, the plaintiff has refused to cash the benefits checks issued pursuant to the Illinois Workers' Compensation Act."

[4]Numerous other actions were also filed, including a case this court has already ruled upon, *Waugh v. Morgan Stanley & Co.*, 2012 IL App (1st) 102653. In that case, appellants Morgan Stanley, the estate of Scott Garland, and the estate of Mark Turek appealed from orders of the trial court granting partial summary judgment to appellees Howard Levinson and Hark Corporation on all claims alleging educational malpractice. *Waugh v. Morgan Stanley & Co.*, 2012 IL App (1st) 102653, ¶ 1. Appellants contended that the trial court erred by characterizing their claim as sounding in the tort of educational malpractice rather than ordinary negligence. *Waugh v. Morgan Stanley & Co.*, 2012 IL App (1st) 102653, ¶ 1. Counterdefendant-appellee Recurrent Training Center, Inc., challenged this court's jurisdiction of the cause and asked that this court dismiss the cross-appeal filed against it as untimely. *Waugh v. Morgan Stanley & Co.*, 2012 IL App (1st) 102653, ¶ 1. We affirmed the decision of the trial court, finding that the claims at issue did, in fact, sound in educational malpractice, a noncognizable tort in the state of Illinois. *Waugh v. Morgan Stanley & Co.*, 2012 IL App (1st) 102653, ¶ 48. We also found that this court had proper jurisdiction over the cause. *Waugh v. Morgan Stanley & Co.*, 2012 IL App (1st) 102653, ¶ 54.

5/27-6 (West 2010)). Specifically, the counts against Morgan Stanley and Turek are as follows:

Count XI: wrongful death and negligence (pursuant to section 1 of the Wrongful Death Act (740 ILCS 180/1 (West 2010)));

Count XII: survival–negligence (pursuant to section 6 of the Survival Act (755 ILCS 5/27-6 (West 2010)));

Count XIII: wrongful death–purposeful danger (pursuant to section 1 of the Wrongful Death Act (740 ILCS 180/1 (West 2010)));

Count XIV: survival–purposeful danger (pursuant to section 6 of the Survival Act (755 ILCS 5/27-6 (West 2010)));

Count XV: wrongful death–dual capacity (pursuant to section 1 of the Wrongful Death Act (740 ILCS 180/1 (West 2010)));

Count XVI: survival–dual capacity (pursuant to section 6 of the Survival Act (755 ILCS 5/27-6 (West 2010))).

Regarding the dual capacity counts, which were based on a tort theory of dual capacity, Garland argued that Morgan Stanley and Turek are liable to decedent Garland in tort because, in relevant part:

"11. On and before January 30, 2006, and at all relevant times, Defendant, MORGAN STANLEY, knew and approved of, and authorized and facilitated, the practice of its financial advisors [including Turek] utilizing private aircraft for purposes of conducting MORGAN STANLEY business and transporting MORGAN STANLEY employees for MORGAN STANLEY business.

12. On and before January 30, 2006, and at all relevant times, Defendant, MORGAN STANLEY, knew of the aforesaid custom and habit of MORGAN STANLEY advisors utilizing private aircraft for MORGAN STANLEY business travel and, to aid and encourage that practice, had a policy to reimburse pilots for the expenses arising from the use of such private aircraft.

***

15. On and before January 30, 2006, Defendant, MORGAN STANLEY, knew or should have known that Defendant, TUREK was utilizing private aircraft for MORGAN STANLEY business travel, including a business trip from Palwaukee Airport in Wheeling, Illinois, to Olathe, Kansas.

16. On and before January 30, 2006, by reason of the foregoing, Defendant, MORGAN STANLEY's authorization and approval of Defendant TUREK's operation of the Cessna 421B aircraft purposefully and recklessly created, and constituted, a dangerous condition.

17. On January 30, 2006, as a result of Defendant MORGAN STANLEY's complete lack of any rules, regulations, policies or procedures to ensure its employees were transported by qualified, competent and experienced employee pilots, Decedent SCOTT GARLAND was taken aboard the aforesaid Cessna 421B aircraft by TUREK without knowing MORGAN STANLEY employee MARK TUREK was inexperienced and

-6-

unqualified in the operation of that aircraft, and without knowing TUREK was engaging in a test and demonstration flight for Defendant KNUDSON related to TUREK's potential purchase of an ownership interest in said aircraft.

***

19. On January 30, 2006 Defendant MARK TUREK had a dual purpose for traveling to Kansas in the Cessna 421B aircraft that was owned by Kenneth Knudson and Howard Levinson, and was acting in a dual capacity with respect to said flight in that TUREK transported SCOTT GARLAND and MICHAEL WAUGH to Kansas for the purpose of meeting a prospective MORGAN STANLEY client; and TUREK also was traveling to Kansas for the purpose of engaging in a test and demonstration flight to permit KNUDSON to evaluate TUREK's competency in the operation of the Cessna 421B aircraft with respect to TUREK's interest in purchasing partial ownership of the plane.

20. On January 30, 2006, while Defendant MARK TUREK was engaging in the aforesaid dual purpose flight, TUREK was also acting as the agent, apparent agent and employee of Defendant MORGAN STANLEY, and therefore Defendant MORGAN STANLEY necessarily was engaged in a dual purpose flight and was acting in a dual capacity with respect to said flight.

21. On and before January 30, 2006, Defendant MORGAN STANLEY also further acted in a dual capacity in that it provided financial services to its clients, and in a separate capacity it affirmatively engaged in arranging, providing, facilitating and approving various types of travel and transportation for its employees."

¶ 17    Morgan Stanley filed a motion to dismiss pursuant to section 2-619 of the Code, arguing that the claims were barred by the exclusive remedy provision of the Act. In addition, it argued that plaintiff "cannot bypass the [Act's] exclusive remedy provision because Morgan Stanley did not have a specific intent to harm Mr. Garland nor was it acting in a dual capacity at the time of the accident."

¶ 18    Turek moved for summary judgment against Garland, arguing that the Act "provides the exclusive remedy of an injured employee against an alleged negligent co-employee who is acting in the course and scope of his employment," and that, because Turek and Garland were both acting in the course and scope of their employment when the accident occurred, Garland's exclusive remedy lies within the Act. In his motion, he noted that "[a]n employee is barred from bringing a common law suit against his co-employee for a work-related injury unless he shows that a legally recognized exception to section 305/5(a) [of the Act] exists." He argued that there was no dual capacity, as

"the duties of the defendant Morgan Stanley and Mark Turek, in traveling to meet with prospective financial clients, and their business as financial advisors are so intertwined that the conduct in the second role cannot be deemed to generate obligations unrelated to those flowing from the defendant's first role as agent or employer."

Relying on *Ocasek v. Krass*, 153 Ill. App. 3d 215 (1987), Turek argued that Turek's piloting the airplane did not endow him with a second legal persona completely independent from and unrelated to his status as a co-employee, nor endow Morgan Stanley with a second legal persona completely independent from and unrelated to its status as an employer.

¶ 19     In July 2011, following arguments from the parties, the trial court entered judgment for Turek and against Garland, as well as judgment for Morgan Stanley and against Garland. Garland appeals from these orders.

¶ 20                                    II. ANALYSIS

¶ 21     Plaintiff Garland appeals, contending the trial court erred in dismissing her claims against Morgan Stanley and Turek. Specifically, she argues that her claims are not barred by the exclusivity provision of the Act because this case involves: (1) purposeful endangerment rather than pure negligence; and (2) dual capacity. For the following reasons, we disagree.

¶ 22     Summary judgment is proper when the pleadings, affidavits, depositions and admissions of record, construed strictly against the moving party, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. *Morris v. Margulis*, 197 Ill. 2d 28, 35 (2001); 735 ILCS 5/2-1005 (West 2010). This relief is an appropriate tool to employ in the expeditious disposition of a lawsuit in which " 'the right of the moving party is clear and free from doubt.' " *Morris*, 197 Ill. 2d at 35 (quoting *Purtill v. Hess*, 111 Ill. 2d 229, 240 (1986)). In ruling on a motion for summary judgment, the circuit court is to determine whether a genuine issue of material fact exists, not try a question of fact. *Williams v. Manchester*, 228 Ill. 2d 404, 417 (2008). A party opposing a motion for summary judgment "must present a factual basis which would arguably entitle him to a judgment." *Allegro Services, Ltd. v. Metropolitan Pier & Exposition Authority*, 172 Ill. 2d 243, 256 (1996). When determining whether a genuine issue of material fact exists, courts construe the pleadings liberally in favor of the nonmoving party. *Williams*, 228 Ill. 2d at 417. "Summary judgment is to be encouraged in the interest of prompt disposition of lawsuits, but as a drastic measure it should be allowed only when a moving party's right to it is clear and free from doubt." *Pyne v. Witmer*, 129 Ill. 2d 351, 358 (1989). "If the plaintiff fails to establish any element of the cause of action [asserted], summary judgment for the defendant is proper." *Governmental Interinsurance Exchange v. Judge*, 221 Ill. 2d 195, 215 (2006). We review summary judgment rulings *de novo* (*Espinoza v. Elgin, Joliet & Eastern Ry. Co.*, 165 Ill. 2d 107, 113 (1995)), and we will only disturb the decision of the trial court where we find that a genuine issue of material fact exists. *Addison v. Whittenberg*, 124 Ill. 2d 287, 294 (1988).

¶ 23     A section 2-619 motion to dismiss admits the legal sufficiency of the plaintiff's complaint but asserts affirmative defenses or other matter that avoids or defeats the plaintiff's claim. *DeLuna v. Burciaga*, 223 Ill. 2d 49, 59 (2006). An " '[a]ffirmative matter' is something in the nature of a defense that completely negates the cause of action or refutes crucial conclusions of law or conclusions of material fact contained in or inferred from the complaint." *Golden v. Mullen*, 295 Ill. App. 3d 865, 869 (1997). All properly pleaded facts are accepted as true and a reviewing court is concerned only with the question of law presented by the pleadings. *Thornton v. Shah*, 333 Ill. App. 3d 1011, 1019 (2002). Dismissal is proper where "the claim asserted against defendant is barred by other affirmative matter avoiding the legal effect of or defeating the claim." 735 ILCS 5/2-619(a)(9) (West 2010). Such affirmative matter has been defined as "a type of defense that either negates an alleged

cause of action completely or refutes crucial conclusions of law or conclusions of material fact unsupported by allegations of specific fact contained in or inferred from the complaint." *Neppl v. Murphy*, 316 Ill. App. 3d 581, 585 (2000). Rulings on section 2-619 motions are reviewed *de novo*. *DeLuna*, 223 Ill. 2d at 59.

¶ 24    "The Workers' Compensation Act (Act) [citation] was enacted to abrogate the system of common law rights and liabilities which previously governed an injured employee's ability to recover against his employer." *Ocasek*, 153 Ill. App. 3d at 217 (citing *Sharp v. Gallagher*, 95 Ill. 2d 322, 326 (1983)). The policy underlying the Act was "to provide certainty of remedy gained in return for limiting the liability of the employer." *Ocasek*, 153 Ill. App. 3d at 217; see also *Sharp*, 95 Ill. 2d at 326 ("The Act establishes a new 'system of liability without fault, designed to distribute the cost of industrial injuries without regard to common-law doctrines of negligence, contributory negligence, assumption of risk and the like.' [Citation.] 'Balanced against the imposition of no-fault liability upon the employer are statutory limitations upon the amount of the employee's recovery, depending upon the character and the extent of the injury.' [Citation.]"). To effectuate this policy, the Act specifically provided that " 'the statutory remedies under it shall serve as the employee's exclusive remedy if he sustains a compensable injury.' " *Ocasek*, 153 Ill. App. 3d at 217 (quoting *Sharp*, 95 Ill. 2d at 326); see also 820 ILCS 305/5(a) (West 2010). Section 5(a) of the Act provides, in pertinent part:

"No common law or statutory right to recover damages from the employer *** for injury or death sustained by an employee while engaged in the line of his duty as such employee, other than the compensation herein provided, is available to any employee who is covered by the provisions of this Act, to any one wholly or partially dependent upon him, the legal representatives of his estate, or any one otherwise entitled to recover damages for such injury." 820 ILCS 305/5(a) (West 2010).

Section 11 of the Act provides:

"The compensation herein provided, together with the provisions of this Act, shall be the measure of the responsibility of any employer *** who has elected to provide and pay compensation for accidental injuries sustained by any employee arising out of and in the course of the employment according to the provisions of this Act ***." 820 ILCS 305/11 (West 2010).

Essentially, these sections of the Act require "exclusive resort" to the worker's compensation remedy for injuries arising out of the course of employment. *Esposito v. Dior Builders*, 274 Ill. App. 3d 338, 345 (1995). Our supreme court has explained:

"The Workers' Compensation Act is designed to provide financial protection to workers for accidental injuries arising out of and in the course of employment. (See *Pathfinder Co. v. Industrial Comm'n* (1976), 62 Ill. 2d 556.) Accordingly, the Act imposes liability without fault upon the employer and, in return, prohibits common law suits by employees against the employer. The exclusive remedy provision 'is part of the *quid pro quo* in which the sacrifices and gains of employees and employers are to some extent put in balance, for, while the employer assumes a new liability without fault, he is relieved of the prospect of large damage verdicts.' (2A A. Larson, Law of Workmen's Compensation

§ 65.11 (1988).)" *Meerbrey v. Marshall Field & Co.*, 139 Ill. 2d 455, 462 (1990).

¶ 25    Additionally, the Act operates to make workers' compensation benefits the exclusive remedy of an injured employee against a negligent co-employee acting in the course and scope of his employment. *Fregeau v. Gillespie*, 96 Ill. 2d 479, 484 (1983). An employee is barred from bringing a common law suit against his co-employee for a work-related injury unless the employee shows that a legally recognized exception to the exclusive remedy provision of the Act exists. *Fregeau*, 96 Ill. 2d at 484-86.

¶ 26    In order to circumvent this bar on common law actions imposed by the Act, a plaintiff must allege and prove the injury either: (1) was not accidental; (2) did not arise out of employment; (3) was not incurred during the course of employment; or (4) was noncompensable under the Act. *Meerbrey*, 139 Ill. 2d at 463.[5]

¶ 27                                A. Accidental Injury

¶ 28    Plaintiff contends that two exceptions to the exclusivity rule of the Act apply here: (1) the injury was not accidental; and (2) the dual capacity doctrine applies. We first address plaintiff's contention that the exclusive remedy rule of the Act does not apply because the injury at issue was not accidental, but rather was an intentional tort. Plaintiff argues that Morgan Stanley: (1) had a business travel policy permitting its employees to use private aircraft for business travel; (2) knew that its advisors used private aircraft for business travel; (3) knew or should have known that Garland and Turek would be using a private aircraft on the trip from Palwaukee airport in Wheeling to Kansas and back; and (4) knew that Turek was a pilot, but had no "rules, regulations, policy or process to determine the piloting qualifications, experience, credentials, type ratings, licensing or certification of its employee pilots" or "rules, standards, or criteria for the type, size, or operating characteristics of the aircraft its employees were using." She further alleges willful and wanton misconduct against Morgan Stanley and claims that it owed a duty "not to subject its employee Scott Garland to unreasonably dangerous conditions by authorizing, with a conscious disregard for the safety of others, the use of private aircraft by inexperienced and unqualified pilots." She claims that Morgan Stanley, through its agent and employee Mark Turek, "intentionally engaged in wilful and wanton misconduct" with "an utter indifference to, or a conscious disregard for, the safety of others."

_____

[5]The injury at issue here occurred while the employee, Garland, was traveling. "A 'traveling employee' is one who is required to travel away from his employer's premises in order to perform his job." *Cox v. Illinois Workers' Compensation Comm'n*, 406 Ill. App. 3d 541, 545 (2010) (quoting *Jensen v. Industrial Comm'n*, 305 Ill. App. 3d 274, 278 (1999)). Generally, a traveling employee is considered to be in the course of his employment from the time he leaves home until he returns, so long as his actions are reasonable and foreseeable. *Cox*, 406 Ill. App. 3d at 545 (citing *Urban v. Industrial Comm'n*, 34 Ill. 2d 159, 162-63 (1966), and *Wright v. Industrial Comm'n*, 62 Ill. 2d 65, 71 (1975)). The parties do not contest that the Act would normally apply to Garland's case, but argue that the exclusive remedy provision of the Act is not applicable here for a number of reasons, which are addressed herein.

-10-

¶ 29    In order to bypass the exclusive remedy of the Act, plaintiff attempts to show that decedent Garland's injury was not accidental. An injury is accidental within the meaning of the Act when it is traceable to a definite time, place, and cause, and occurs in the course of the employment unexpectedly and without affirmative act or design of the employee. *Matthiessen & Hegeler Zinc Co. v. Industrial Board*, 284 Ill. 378 (1918). In the context of the Act, to show that an injury is not accidental, the employee must establish that his employer or co-employee acted deliberately and with specific intent to injure the employee. *Copass v. Illinois Power Co.*, 211 Ill. App. 3d 205, 214 (1991); see also *Limanowski v. Ashland Oil Co.*, 275 Ill. App. 3d 115, 120 (1995) (employee seeking to recover against employer must prove, by a preponderance of the evidence, that the employer specifically intended to injure the plaintiff). The *Copass* court quoted Professor Larson's treatise on workers' compensation law as follows:

> " 'Even if the alleged conduct goes beyond aggravated negligence, and includes such elements of knowingly permitting a hazardous work condition to exist, knowingly ordering a claimant to perform an extremely dangerous job, wilfully failing to furnish a safe place to work, or even wilfully and unlawfully violating a safety statute, this still falls short of the kind of actual intention to injure that robs the injury of accidental character.' " *Copass*, 211 Ill. App. 3d at 214 (quoting 2A Arthur Larson, Workmen's Compensation Law § 68.13, at 13-36 to 13-44 (1990)).

¶ 30    Plaintiff attempts to modify this standard, asking us to determine that the intent requirement in the case at bar "is satisfied by intending that the victim be exposed to the dangers which ultimately caused the injuries, and does not require the specific intent that the victim be injured or killed." This argument is unpersuasive where the case law is clear that, for an employee seeking to bypass the exclusive remedy of the Act, the employee must show that the employer specifically intended to injure the plaintiff. See, *e.g.*, *Copass*, 211 Ill. App. 3d at 214 ("an employee alleging an intentional tort against his employer or co-employee must allege that the defendant acted deliberately with specific intent to injure the employee"); *Mayfield v. ACME Barrel Co.*, 258 Ill. App. 3d 32, 35 (1994) ("Whether an injury is accidental for the purposes of applying the Act is dependent upon the object of the employer's intention. It is only when the employer acts with [the] specific intent to injure the employee that the resultant injury is stripped of its accidental character."); *Bercaw v. Domino's Pizza, Inc.*, 258 Ill. App. 3d 211, 218 (1994) (agreeing with the *Copass* court "that the 'specific intent to injure' test is in keeping with the basic purposes of the Act"); *Limanowski*, 275 Ill. App. 3d at 120 (employee seeking to recover against employer must prove, by a preponderance of the evidence, that the employer specifically intended to injure the plaintiff).

¶ 31    Here, plaintiff cannot show that either Morgan Stanley or Turek intended to injure or kill Garland. Rather, considering the evidence in the light most favorable to plaintiff, as we are bound to do on review of a grant of summary judgment (*Williams*, 228 Ill. 2d at 417) and dismissal pursuant to section 2-619 (*Thornton*, 333 Ill. App. 3d at 1019), the evidence before us shows that the aircraft crash was, at most, a terribly unfortunate accident caused by negligence. The record shows that Turek was a licensed and trained pilot with many hours of flight experience who hoped to purchase a partial ownership of the subject aircraft. The

-11-

parties disagree as to how integrated Morgan Stanley was regarding its employees' use of private aircraft on business trips and in this flight in particular. Regardless, we find no error in the dismissal of these counts, as plaintiff failed to show defendants, or anyone for that matter, acted deliberately with the specific intent to injure Garland. See *Copass*, 211 Ill. App. 3d at 212.

¶ 32                                    B. The Dual Capacity Doctrine

¶ 33     We next address plaintiff's contention that the exclusive remedy rule of the Act does not apply here because the dual capacity doctrine applies to the liability of both Turek and Morgan Stanley. Specifically, plaintiff argues that Morgan Stanley and Turek were both acting in an independent and distinct capacity of providing air transport services unrelated to their status as employer (Morgan Stanley) and co-employee (Turek). She argues that Turek's practice of flying private aircraft on behalf of Morgan Stanley was too unrelated to its business as a financial entity to represent anything other than a second capacity, which capacity is a recognized exception to the exclusive remedy provision of the Act. She further argues that Morgan Stanley's practice of reimbursing its employees' travel expenses shows that Morgan Stanley ran a "*de facto* air transport operation" so unrelated to its business of providing financial services that it was a clear second capacity under the dual capacity doctrine. We disagree.

¶ 34     Illinois courts have recognized a limited exception to the exclusive remedy provision, known as the dual capacity doctrine. Under the dual capacity doctrine, " 'an employer normally shielded from tort liability by the exclusive remedy principle may become liable in tort to his own employee if he occupies, in addition to his capacity as employer, a second capacity that confers on him obligations independent of those imposed on him as employer.' " *Ocasek*, 153 Ill. App. 3d at 217 (quoting 2A Arthur Larson, Workmen's Compensation § 72.80, at 14-112 (1976)).

¶ 35     Our supreme court first adopted the dual capacity doctrine in *Smith v. Metropolitan Sanitary District of Greater Chicago*, 77 Ill. 2d 313 (1979). There, an employee of a joint venture brought a product liability action against one of the joint venturers for injuries sustained when he was struck by an allegedly defective truck which had been leased by that joint venturer to the joint venture. *Smith*, 77 Ill. 2d at 316. The joint venturer argued in a motion for summary judgment that the employee was barred from bringing the suit pursuant to the exclusive remedy provision of the Worker's Compensation Act because he had already applied for workers' compensation benefits with the Illinois Industrial Commission. *Smith*, 77 Ill. 2d at 316. The circuit court granted the joint venturer's motion for summary judgment, but this court reversed. *Smith*, 77 Ill. 2d at 316.

¶ 36     Our supreme court affirmed the finding of the appellate court, holding that the dual capacity doctrine applied so as to circumvent the exclusive remedy provision of the Act. *Smith*, 77 Ill. 2d at 318-20. In doing so, our supreme court adopted the definition of the dual capacity doctrine in Professor Larson's treatise on workers' compensation law, and explained that the dual capacity doctrine applies when an employer is acting in two "capacities," such that the second capacity " 'confers on him obligations independent of those imposed on him

-12-

as employer.' " *Smith*, 77 Ill. 2d at 318 (quoting 2A Arthur Larson, Workmen's Compensation § 72.80, at 14-112 (1976)). The court further held that "[a] mere separate theory of liability against the same legal person as an employer is not a true basis for use of the dual capacity doctrine" but that, rather, the doctrine "requires a distinct separate legal *persona*." *Smith*, 77 Ill. 2d at 319 (citing 2A Arthur Larson, Workmen's Compensation § 72.80 (Supp. 1979)).

¶ 37    Applying this test to the facts of that case, our supreme court in *Smith* found that the allegedly defective truck which injured the employee was not a tool furnished by the joint venturer as a member of the joint venture, but rather as equipment leased to the joint venture under the "express terms of the joint-venture agreement." *Smith*, 77 Ill. 2d at 319. Accordingly, the court found that the plaintiff's right to recover "should not depend upon whether the truck which struck him was leased to his employer by one of its members or by a lessor with no other relationship to the joint-venture employer." *Smith*, 77 Ill. 2d at 320. Likewise, the court found that "defendant's liability as a lessor of equipment should not be dependent upon whether it was solely a lessor or occupied the coincidental status of a member of the joint venture." *Smith*, 77 Ill. 2d at 320.

¶ 38    Subsequent to *Smith*, our supreme court once again addressed the dual capacity doctrine in *Sharp v. Gallagher*, 95 Ill. 2d 322 (1983). In that case, an employee filed a common law negligence claim against his contractors-employers, who also owned the land on which the employee was injured. *Sharp*, 95 Ill. 2d at 324. The contractors-employers filed a motion to dismiss, arguing that the plaintiff's suit was barred by the exclusivity provision of the Worker's Compensation Act. *Sharp*, 95 Ill. 2d at 325. The circuit court granted the motion, but this court reversed, finding that, under the dual capacity doctrine, the defendants' capacity as landowners conferred upon them a duty independent of that owed to plaintiff as an employer. *Sharp*, 95 Ill. 2d at 325-26.

¶ 39    Our supreme court disagreed, and reversed the finding of the appellate court. *Sharp*, 95 Ill. 2d at 326. In so doing, the court emphasized the second prong of the dual capacity doctrine, noting that the key question in determining whether the dual capacity doctrine applies is whether an employer is acting as a "separate legal entity." *Sharp*, 95 Ill. 2d at 328. The court then went on to explain that its prior holding in *Smith* was made on this same basis, noting that in *Smith*, it had previously stated that the " 'doctrine *** requires a distinct separate legal *persona*,' " and that the employer in that case was specifically "found to [have] be[en] acting as a separate legal entity." *Sharp*, 95 Ill. 2d at 328 (quoting *Smith*, 77 Ill. 2d at 319). The court in *Sharp* then went on to find that an employer cannot be sued as the owner or occupier of land because, among other things, "mere ownership of land does not endow a person with a second legal persona or entity." (Internal quotation marks omitted.) *Sharp*, 95 Ill. 2d at 328. The court therefore concluded that since the facts of that case revealed "but one legal entity, the application of the dual-capacity doctrine [was] unavailable to the plaintiff." *Sharp*, 95 Ill. 2d at 328.

¶ 40    Since the holding in *Sharp*, our appellate courts have consistently interpreted the decisions in *Smith* and *Sharp* to require a two-prong test to determine whether an employer was acting in a dual capacity. See, *e.g.*, *Stewart v. Jones*, 318 Ill. App. 3d 552, 565 (2001); *Guerino v. Depot Place Partnership*, 273 Ill. App. 3d 27, 32 (1995); *Ocasek*, 153 Ill. App.

-13-

3d at 217-18; *Hyman v. Sipi Metals Corp.*, 156 Ill. App. 3d 207, 212 (1987). Under this two-prong test, in order to invoke the dual capacity doctrine as an exception to the exclusive remedy provided by the Act, the plaintiff has the burden of establishing both that: (1) the employer was acting in two "capacities," such that the second capacity confers upon him obligations unrelated to those flowing from the first, that of employer; and that (2) the employer was acting as a distinct separate legal persona. *Ocasek*, 153 Ill. App. 3d at 217-18.[6] Under the second prong of the dual capacity doctrine, "[a]n employer may become a third person, vulnerable to tort suit by an employee, if–and only if–it possesses a second persona so completely independent from and unrelated to its status as employer that by established standards the law recognizes that persona as a separate legal person." Arthur Larson & Lex K. Larson, Larson's Worker's Compensation Law § 113.01(1) (2007); see also *Ocasek*, 153 Ill. App. 3d at 217.

¶ 41    Our courts have been clear that the second prong of the dual capacity doctrine test mandating that the employer have a "distinct legal persona" is a requisite in and of itself and separate from the first one, which requires that the employer be conferred with separate obligations and duties independent of those imposed on him as an employer. See *Sharp*, 95 Ill. 2d at 328 (noting the importance of the second prong of the dual capacity test, apart from the first, and reiterating that even in *Smith*, which did not specifically delineate the second prong of the analysis, the doctrine of dual capacity was applied "on the basis that the employer *** was found to be acting as a *separate legal entity*" (emphasis added)); see also *Ocasek*, 153 Ill. App. 3d at 217 (citing 2A Arthur Larson, Workmen's Compensation § 72.81 (1986) (establishing the two-prong test for the dual capacity doctrine)); see also *Stewart*, 318 Ill. App. 3d at 565 (requiring that the plaintiff meet the burden of both the first and second prongs of the dual capacity doctrine test); *Guerino*, 273 Ill. App. 3d at 32 (requiring that the plaintiff meet the burden of both the first and second prongs of the dual capacity doctrine test); see also *Sobczak v. Flaska*, 302 Ill. App. 3d 916, 923-24 (1998) (applying both prongs of the test to determine whether the dual capacity exception applied).

¶ 42    In addition, the term "persona" is not flexible. Arthur Larson & Lex K. Larson, Larson's Worker's Compensation Law § 113.01(2) (2010). As Professor Larson has explained in his treatise on workers' compensation law:

"The choice of the term 'persona' is not the result of any predilection for elegant Latinisms for their own sake; it is dictated by the literal language of the typical third-party statute, which usually defines a third party, in the first instance, as 'a person other than the employer.' This is quite different from 'a person acting in a capacity other than

---

[6]Several of our appellate courts have gone one step further and held that, after *Sharp*, the second prong of the dual capacity doctrine is the most important, if not the only relevant, prong. See, *e.g.*, *Hyman*, 156 Ill. App. 3d at 213 (noting that the decision in *Sharp* signals a deliberate narrowing of the dual capacity doctrine, with a primary focus on the second prong of the test, namely "the separateness of the entities involved in the controversy"); see also *Toth v. Westinghouse Elevator Co.*, 114 Ill. App. 3d 905, 907-08 (1983) (noting that the "parameters" of the dual capacity doctrine were "modified" by *Sharp*, shifting from whether the employer occupied a second, independent role, to "an exclusive concern with whether the controversy involved separate legal entities or *persona*").

that of employer.' The question is not one of activity or relationship–it is one of identity." Arthur Larson & Lex K. Larson, Larson's Worker's Compensation Law § 113.01(2) (2007).

Professor Larson has further noted that courts should not resort to "legal fictions" to get around the meaning of "persona," noting:

"It is one thing to resort to such fictions when the task is to create new law out of thin air, or to break down the artificial walls of old forms of action. It is quite another thing to take a statute consisting of 45 pages of fine print, complete with elaborate definitions of what the key words mean, and then announce judicially that those words do not mean what the legislature said they mean." Arthur Larson & Lex K. Larson, Larson's Workers' Compensation Law § 113.01(2) (2007).

¶ 43 Applying these principles to the case at bar, we find that plaintiff has failed to meet either of the requirements necessary to avail herself of the dual capacity doctrine. In our consideration of this issue, we find *Ocasek* instructive to the case at bar.[7] In that case, our appellate court specifically addressed the issue of business travel in a private aircraft and determined that "the mere fact that the employer, as an individual, pilots an airplane, drives a car, or performs such other functions which impose upon him the duty to exercise due care, does not serve to endow him with a second legal *persona* so completely independent from and unrelated to his status as an employer." *Ocasek*, 153 Ill. App. 3d at 218. The *Ocasek* court specifically rejected the proposition that an employer takes on a separate legal persona by virtue of owing a duty to the general public. *Ocasek*, 153 Ill. App. 3d at 218. The court specifically held that Ocasek did not meet the second requirement of showing the employer's alleged second capacity as an airplane pilot generated obligations unrelated to those flowing from his capacity as an employer. *Ocasek*, 153 Ill. App. 3d at 218.

¶ 44 In *Ocasek*, an employee of a lamp manufacturer, Lily Krass, died in a plane crash. *Ocasek*, 153 Ill. App. 3d at 216. The plane, which had been returning from a trade show, was piloted by one of the general partners of the lamp manufacturer, Lily's husband Albert Krass. *Ocasek*, 153 Ill. App. 3d at 216. The administrator of employee Lily's estate brought a negligence claim against the lamp manufacturer, alleging that the general partner was negligent in operating the plane, and that his negligence proximately resulted in the employee's death. *Ocasek*, 153 Ill. App. 3d at 216. In its defense, the lamp manufacturer raised the exclusive remedy provision of the Act as an affirmative defense, arguing that the general manager was the plaintiff's employer and that the crash occurred on their return from a business trip. *Ocasek*, 153 Ill. App. 3d at 216. Like the case at bar, Albert was a licensed pilot and his company reimbursed him for fuel when he flew on company business. *Ocasek*,

---

[7]We note that plaintiff disagrees that we should find *Ocasek* instructive to the case at bar. Instead, plaintiff argues that *Ocasek* is "readily distinguishable on a factual basis," and argues that the "decision is not well-founded in logic, law, or facts." Plaintiff argues *Ocasek* is inapplicable to the case at bar because it involved an employer flying his own plane, where as here, Morgan Stanley did not own the subject airplane. The ownership of the airplane or vehicle used in business travel, however, is not a relevant factor in analyzing the legal duties and responsibilities owed by a pilot who is also an employer or employee.

153 Ill. App. 3d at 218.

¶ 45    In a motion for summary judgment, the administrator of the employee's estate sought to invoke the dual capacity doctrine by arguing that the general partner's status as a pilot created unrelated obligations to the general public, thereby creating in the employer two separate legal personas. *Ocasek*, 153 Ill. App. 3d at 216. The circuit court agreed with the administrator and found that the dual capacity doctrine applied. *Ocasek*, 153 Ill. App. 3d at 216.

¶ 46    The appellate court, however, rejected this contention, finding that "the mere fact that the employer, as an individual, pilots an airplane, drives a car, or performs other such functions which impose upon him the duty to exercise due care, *does not serve to endow him with a second legal persona* completely independent from and unrelated to his status as an employer." (Emphasis added.) *Ocasek*, 153 Ill. App. 3d at 218-19 ("We *** do not accept the plaintiff's argument that the dual-capacity doctrine was applicable simply because [the general partner's] status as an airplane pilot created obligations to the general public."); see also *Murcia v. Textron, Inc.*, 342 Ill. App. 3d 433, 439 (2003) (recognizing *Ocasek* and noting that in that case the court found that "the dual capacity doctrine is not applicable simply because the employers' additional capacity creates obligations to the general public").

¶ 47    Here, as to Morgan Stanley, plaintiff argues that Morgan Stanley acted in a dual capacity because it provided financial services to its clients in one capacity and, in a separate capacity, affirmatively engaged in arranging business travel for its employees. Plaintiff also argues that Turek's alleged dual capacity nullifies Morgan Stanley's exclusive remedy defense. We disagree.

¶ 48    The record on appeal shows that Morgan Stanley is in the business of providing financial services. At the time of his death, Turek was employed by Morgan Stanley as a financial adviser. Turek was decedent Garland's immediate supervisor. It appears from the record that Morgan Stanley did not have a formal policy prohibiting the use by its employees of private aircraft for business travel, and would reimburse its employees for their out-of-pocket expenses. Although plaintiff argues that Morgan Stanley essentially ran a travel entity under which it organized, enabled, and paid its financial advisors to fly their own aircraft on business, this is not what the record reveals. In fact, Jeffery Adams testified that only 5 financial advisors out of approximately 1,000 in Morgan Stanley's Midwestern branches had pilot licenses. Manager Thomas Ryan testified that Turek only requested reimbursement for flight expenses on two or three previous occasions. From the record before us, it appears to us that private aircraft were only used by Morgan Stanley financial advisors for business purposes on rare occasions, and then only by a select few financial advisors who had pilot licenses who were not paid for these services but merely reimbursed their travel expenses up to a monetary cap. This does not rise to the "de facto air transportation business" plaintiff accuses Morgan Stanley of running.

¶ 49    As to Turek, plaintiff argues Turek was in a dual capacity of providing air transportation as well as working as a financial advisor for Morgan Stanley. Plaintiff argues that Turek's role of providing financial advisory services for Morgan Stanley and his piloting a private aircraft while on a business trip are so independent one from the other that they constitute

-16-

an exception to the Act. Plaintiff also alleges that Turek had an additional purpose for the subject flight beyond conducting Morgan Stanley business, that is, test driving the airplane.

¶ 50 The record shows only that Turek was a Morgan Stanley employee and that he embarked on a business trip to Kansas from Chicago in that role: he and his co-employee Garland traveled with their client, Waugh, with the purpose of meeting with Waugh's father with the ultimate goal of securing him as a new Morgan Stanley client. They went to Kansas, met with the elder Waugh, and discussed business with him. That Turek, a qualified pilot, elected to fly a private aircraft on this business trip, and that the others on the plane elected to fly with him, does not change the purpose of this trip. Nor does that possibility that, at the time of the trip, Turek was considering purchasing a share in the subject aircraft and that Knudson was watching to see how Turek handled the aircraft during flight change the purpose of the trip. Like in *Ocasek*, Turek's piloting the aircraft did not create a distinct, separate legal persona. Like in *Ocasek*, the duties and obligations of Turek in his business as a financial advisor and in traveling to meet with prospective financial clients are so intertwined that the conduct in the second role cannot be deemed to generate obligations unrelated to those flowing from his first role as an agent of Morgan Stanley and a co-employee of Garland. Turek did not occupy any status so as to create a wholly separate identity or set of obligations unrelated to Morgan Stanley's role as employer or Turek's role as employee.

¶ 51 For all of these reasons, we find no error in the trial court's determination that these counts should be dismissed and summary judgment granted, where this cause falls squarely into the exclusive remedy provision of the Act. Our conclusion comports with the general rule in our state that any exceptions to the exclusive remedy provision of the Act or any theories which would allow that provision to be circumvented "must be strictly construed." *Rosales v. Verson Allsteel Press Co.*, 41 Ill. App. 3d 787, 789 (1976). The rationale behind this principle is:

> "The continued effectiveness of the workmen's compensation scheme depends upon the continued ability to spread the risk of such losses. This, in turn, depends upon the maintenance of the legislative scheme. If employers are required to provide not only workmen's compensation, but also to defend and pay in common law actions, their ability to spread such risks through reasonable insurance premiums is threatened." *Rosales*, 41 Ill. App. 3d at 789.

¶ 52                                III. CONCLUSION

¶ 53 For the foregoing reasons, we affirm the decision of the circuit court of Cook County.

¶ 54 Affirmed.