# Illinois Official Reports

## Appellate Court

---

**Garland v. Sybaris Club International, Inc., 2014 IL App (1st) 112615**

---

| | |
|---|---|
| Appellate Court Caption | JENNIFER E. GARLAND, Independent Administrator of the Estate of Scott A. Garland, Deceased, Plaintiff-Appellant, v. SYBARIS CLUB INTERNATIONAL, INC., SYBARIS VENTURES ONE, LLC, RANDELL D. REPKE, Independent Executor of the Estate of Kenneth C. Knudson, Deceased, HK GOLDEN EAGLE, INC., HOWARD D. LEVINSON and HARK CORPORATION, Defendants-Appellees. |
| District & No. | First District, Fourth Division<br>Docket Nos. 1-11-2615, 1-11-2616, 1-11-2617, 1-11-2622 cons. |
| Filed | October 16, 2014 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | In a consolidated appeal involving multiple actions arising from the deaths of four men in the crash of a small airplane, the trial court erred in dismissing the claim made by plaintiff, a surviving spouse, against the individual owners of the plane, the corporate owners and a *de facto* corporate owner for negligent entrustment of the plane to a pilot who was allegedly not sufficiently trained to fly the plane; however, the dismissal of her claim for negligent supervision of the pilot was upheld in the absence of any evidence showing that the owner named as defendant undertook to supervise the pilot, had a duty to do so, or failed in his duty to do so. |
| Decision Under Review | Appeal from the Circuit Court of Cook County, Nos. 06-L-6532, 06-L-3217, 06-L-5121, 06-L-1410; the Hon. Irwin J. Solganick, Judge, presiding. |
| Judgment | Affirmed in part and reversed in part. |

Counsel on
Appeal

Clifford Law Offices, of Chicago (Richard F. Burke, Jr., and Robert P. Sheridan, of counsel), for appellant.

SmithAmundsen, of Chicago (Alan L. Farkas and Michael S. McGrory, of counsel), for appellee Randell D. Repke.

Larose & Bosco, Ltd., of Chicago (Joseph A. Bosco and Paris B. Glazer, of counsel), for appellee HK Golden Eagle, Inc.

Hoff Law Group, of Chicago (Timothy J. O'Connell, of counsel), for appellees Sybaris Club International, Inc., and Sybaris Ventures One, LLC.

Chuhak & Tecson, P.C., of Chicago (William F. DeYoung and Loretto M. Kennedy, of counsel), for appellees Howard D. Levinson and Hark Corporation.

Panel

PRESIDING JUSTICE FITZGERALD SMITH delivered the judgment of the court, with opinion.
Justices Howse and Taylor concurred in the judgment and opinion.

## OPINION

¶ 1      The instant cause involves multiple actions stemming from claims brought following a fatal airplane crash.[1] This is the third time this plane crash has come before this court on appeals arising from orders of dismissal entered by the trial court. In the first, *Waugh v.*

---

[1]The four related cases were consolidated on appeal to this court. Due to the nature of the numerous parties, and for the benefit of the reader, this court will identify and refer to the parties in the following manner:

This court will refer to Jennifer Garland, independent administrator of the estate of Scott A. Garland, deceased, as "plaintiff." This court will refer to Scott Garland, the deceased, as "Garland."

Howard Levinson and Hark Corporation are the parties to appeal No. 1-11-2615. This court will refer to them jointly as the "Levinson Defendants." This court will refer to Howard Levinson individually as "Levinson."

Randell Repke is the executor of the estate of Kenneth Knudson, and is the appellee in case No. 1-11-2616. This court will refer to the party-defendant Knudson as "estate of Knudson" and to Kenneth Knudson prior to death as "Knudson."

HK Golden Eagle, Inc., is the appellee in case No. 1-11-2617. This court will refer to HK Golden Eagle, Inc., as "HK Golden Eagle."

Sybaris Clubs International, Inc., and Sybaris Ventures One, LLC, are the appellees in case No. 1-11-2622. This court will refer to these entities, collectively, as "Sybaris."

This court will refer to all of the appellees jointly as "defendants."

*Morgan Stanley & Co.*, 2012 IL App (1st) 102653, plaintiff Lisa Waugh, surviving spouse of Michael Patrick Waugh, who died in the plane crash, brought a claim of educational malpractice against Howard Levinson and various flight training schools, for allegedly failing to properly instruct Mark Turek in the proper flying and landing procedures for the accident aircraft, a Cessna 421B. *Waugh*, 2012 IL App (1st) 102653. In the second appeal, *Garland v. Morgan Stanley & Co.*, 2013 IL App (1st) 112121, plaintiff Jennifer Garland, surviving spouse of Scott A. Garland, who perished in the plane crash, brought a complaint under the dual capacity doctrine, alleging that defendant Morgan Stanley availed itself so extensively of the use of private pilots and airplanes in its business that it should itself be liable for injuries occurring during those flights. *Garland*, 2013 IL App (1st) 112121. In both appeals, the orders of the trial court granting partial summary judgment as to particular claims and dismissing other claims were affirmed. *Waugh*, 2012 IL App (1st) 102653; *Garland*, 2013 IL App (1st) 112121.

¶ 2    The instant cause arises from the death of Scott Garland. Garland's surviving spouse, plaintiff Jennifer Garland, filed a complaint against numerous persons and entities following Garland's death. By her complaint, plaintiff sought recovery for Garland's death on a number of grounds. As to the Levinson defendants, plaintiff alleged that Levinson had been negligent in entrusting the aircraft to Turek, who, she alleged, was not qualified to fly that particular kind of airplane. As to Knudson, plaintiff alleged negligent entrustment of the aircraft as well as negligent supervision, alleging that Knudson, who was onboard the doomed flight, failed to properly supervise Turek during the flight itself. As to HK, owner of the aircraft, plaintiff alleged it was vicariously liable for its agents, Levinson and Knudson. Plaintiff also sued Sybaris, a group of hotels whose president and founder was Knudson, who conducted the doomed flight in the course of Sybaris business and was, allegedly, a *de facto* owner of the aircraft. Plaintiff appeals the dismissal of her ninth amended complaint pursuant to section 2-619 of the Code of Civil Procedure (the Code) (735 ILCS 5/2-619 (West 2010)) against the named parties herein.

¶ 3                                                      I. BACKGROUND

¶ 4    These consolidated appeals stem from a fatal plane crash. On January 30, 2006, Mark Turek, the pilot in command of a Cessna 421B aircraft, and three passengers, Kenneth Knudson, Scott Garland, and Michael Waugh, were en route from a Kansas airport to the Palwaukee Municipal Airport in Wheeling, Illinois. Turek, Garland, and Waugh were onboard for a Morgan Stanley business trip and Knudson had a prospective business customer in Kansas with whom he wanted to meet. Additionally, Turek was interested in possibly becoming part owner of the subject aircraft. As Turek piloted the Cessna 421B aircraft for landing, the aircraft crashed, killing all four occupants on board.

¶ 5    As we noted in a previous decision regarding this same aircraft crash, Turek was an experienced, licensed private pilot and specifically qualified to fly multi-engine aircraft:

"Prior to January 2006, Turek was fully licensed by the Federal Aviation Administration (FAA) to fly twin-engine aircraft, including the accident aircraft. From January 6 through January 9, 2006, Turek completed a flight training course with Recurrent to transition from his Baron B55 twin-engine plane to the Cessna 421B. Previous to taking this course, Turek had 1,284.05 hours in total fight experience, including over 1,050 hours in multi-engine aircraft. Turek had piloted a

Cessna 421B aircraft for over 29 hours. At the time he completed the Recurrent course, Turek had been an FAA-licensed pilot for nine years. There is no argument made that Turek was not properly qualified to pilot the subject aircraft under FAA regulations." *Waugh*, 2012 IL App (1st) 102653, ¶ 7.

¶ 6      The accident aircraft was owned, operated, and maintained by HK Golden Eagle, Inc. Decedent Knudson and Howard Levinson co-owned HK Golden Eagle.

¶ 7      On January 30, 2006, Turek, Garland, Waugh, and Knudson departed Palwaukee airport in Wheeling, Illinois, in the accident aircraft for Kansas. HK Golden Eagle co-owner Levinson testified in deposition that Knudson would have been watching Turek pilot the aircraft to observe how he handled the controls in flight.

¶ 8      Levinson testified that he was not aware Turek and Knudson were going to have passengers onboard the aircraft on the night of the crash. Levinson also testified that he could not speculate as to whether Knudson would have said anything to Turek if he saw him do something he did not like while flying, or even whether Knudson would have intervened if he saw that Turek, while piloting the aircraft, was in a position of peril.

¶ 9      Following meetings in Kansas, the four men departed Kansas for Palwaukee airport. Turek was piloting the aircraft and Knudson was a pilot-rated passenger. On approach to Palwaukee that evening, the weather was overcast with a mixture of freezing precipitation that turned to light snow and mist. Fifteen minutes prior to the crash, an aircraft near Rockford reported moderate rime icing between 2,500 and 7,000 feet. Pilot Raymond Chou testified in deposition that icing conditions can result in the stalling of an aircraft at a higher speed. Radar at Palwaukee Airport showed that the accident aircraft's airspeed had decreased to 82 knots immediately before the plane crash.

¶ 10      As the airplane approached the Palwaukee airport, it stalled due to low airspeed and crashed, nose-down, killing all aboard. The aircraft fragmented and burned during the impact, resulting in a post crash explosion and fire. The crash occurred at 6:29 p.m.

¶ 11      The National Transportation Safety Board (NTSB) examined the aircraft following the crash and found that the engines and propellers revealed no anomalies that existed prior to impact.[2] The NTSB determined that the probable cause of the crash was "the pilot's failure to maintain airspeed during the landing approach which led to an inadvertent stall and subsequent uncontrolled descent and impact with the ground."

¶ 12      The estates of each decedent filed wrongful death and survival actions, including two cases this court has already ruled upon, *Waugh*, 2012 IL App (1st) 102653, and *Garland*, 2013 IL App (1st) 112121. In the first case, appellants Morgan Stanley, the estate of Scott

---

[2]The National Transportation Safety Board examination report summary states, in part:

"Radio communications confirmed that the airplane had been cleared for a left hand traffic pattern to runway 34. The radar data showed the airplane as it made a turn to the left while its speed decreased to about 82 knots calibrated airspeed as of the last received radar return. This radar return was about 0.1 nautical miles from the accident site and 0.8 nautical miles and 216 degrees from the approach end of runway 34. The airplane owner's manual listed stall speeds ranging from 81 to 94 knots calibrated airspeed for airplane configurations including gear and flaps up to gear down and flaps 15 degrees, and bank angles from 0 to 40 degrees. Flap position could not be determined because the flap chain had separated from the flap drive motor. The owners' manual also listed an approach speed of 103 knots."

Garland, and the estate of Mark Turek appealed from orders of the trial court granting partial summary judgment to appellees Howard Levinson and Hark Corporation on all claims alleging educational malpractice. *Waugh*, 2012 IL App (1st) 102653, ¶ 1. On appeal, appellants contended that the trial court erred by characterizing their claim as sounding in the tort of educational malpractice rather than in ordinary negligence. *Waugh*, 2012 IL App (1st) 102653, ¶ 1. Counterdefendant-appellee Recurrent Training Center, Inc., challenged this court's jurisdiction of the cause and asked that this court dismiss the cross-appeal filed against it as untimely. *Waugh*, 2012 IL App (1st) 102653, ¶ 1. We affirmed the decision of the trial court, finding that the claims at issue did, in fact, sound in educational malpractice, a noncognizable tort in the state of Illinois. *Waugh*, 2012 IL App (1st) 102653, ¶ 48. We also found that this court had proper jurisdiction over the cause. *Waugh*, 2012 IL App (1st) 102653, ¶ 54.

¶ 13    The other case, *Garland*, 2013 IL App (1st) 112121, involved claims filed by decedent Scott Garland's wife, Jennifer Garland, seeking recovery from decedent Garland's employer, Morgan Stanley & Co., Inc., as well as Garland's co-employee and the estate of the deceased pilot of the aircraft at the time of the accident, Mark Turek. *Garland*, 2013 IL App (1st) 112121, ¶ 1. Morgan Stanley and Donna Turek, Mark Turek's widow and the administrator of the estate of Mark Turek, sought dismissal of Garland's common law tort claims based on the exclusive remedy provision of the Illinois Workers' Compensation Act (820 ILCS 305/1 *et seq*. (West 2010)). *Garland*, 2013 IL App (1st) 112121, ¶ 2. The circuit court granted partial summary judgment pursuant to section 2-1005 of the Code (735 ILCS 5/2-1005 (West 2010)) as to her claims against the estate of Turek, as well as a motion to dismiss pursuant to section 2-619 of the Code on claims seeking recovery from decedent Garland's employer, Morgan Stanley & Co., Inc. *Garland*, 2013 IL App (1st) 112121, ¶ 2. On appeal, this court affirmed the trial court's ruling, holding that the application of the exclusive remedy provision of the Workers' Compensation Act was appropriate where the death was accidental and the employer, Morgan Stanley, was not acting in a dual capacity at the time of the aircraft crash. *Garland*, 2013 IL App (1st) 112121, ¶¶ 31, 48, 50.

¶ 14                          A. The History of the Accident Aircraft

¶ 15    Sybaris purchased the accident aircraft in August 2004. In May 2005, the airplane registration was transferred to HK Golden Eagle, Inc., a corporation formed by Knudson and Levinson to own the aircraft. Hark Corporation, an entity owned by Levinson and his wife and created for the purpose of owning the aircraft, was a co-owner of the accident aircraft, along with Knudson, as shareholders of HK Golden Eagle. On the day of the crash, Knudson and Levinson were the owners of the accident aircraft through HK Golden Eagle. They were considering new partners, and Turek was interested in purchasing a partial ownership in the aircraft. Turek arranged with Knudson to fly Garland and Waugh to Kansas in the accident aircraft for the purpose of engaging in a test and demonstration flight that would allow Knudson to evaluate whether he wanted to bring Turek in as a partner in the aircraft.[3]

---

[3]The parties agree that Knudson was evaluating Turek to determine whether he should be brought in as a partner in the aircraft, but disagree as to whether that evaluation was specific to Turek's flying capabilities in a Cessna 421B aircraft, or as to his personality and whether he would be a good "fit" in the partnership.

## B. Turek's Competency

Prior to the accident in January 2006, Turek was fully licensed by the FAA to fly twin-engine aircraft, including the accident aircraft. *Waugh*, 2012 IL App (1st) 102653, ¶ 7. In early January of that year, Turek had completed a flight training course with Recurrent Training Center, Inc., to transition from his Baron B55 twin-engine plane to the Cessna 421B. *Waugh*, 2012 IL App (1st) 102653, ¶ 7. He had 1,285.05 hours of total flight experience, including 1,052.65 hours in multi-engine aircraft, 161.2 hours in single-engine airplanes, and 70.2 hours in flight simulator devices. Specific to a Cessna 421, Turek had logged 32.75 hours in Cessna 421 aircraft. Of those 32.75 hours, 18.2 were obtained prior to Turek having received the required instruction to act as a pilot in command of a pressurized airplane, and 27.5 of those hours were obtained prior to Turek having received dual instruction in a Cessna 421. Turek's flight logbooks showed a total of 5.25 hours of logged dual instruction in Cessna 421 airplanes.

In a previous opinion, we noted:

"Recurrent flight instructor Kyle Lyons testified at deposition that Turek, when completing his training coursework at Recurrent, demonstrated through performance and testing that he was fully proficient, competent, and prepared to fly. He also demonstrated that he was aware of the specifics of a Cessna 421B aircraft. Specifically, Turek completed a Cessna 421B workbook which was reviewed by a Recurrent instructor to verify that Turek was familiar with all information specific to the Cessna 421B. Turek was provided with information on Cessna 421B power settings, speeds, and other procedures for operating in the landing phase of flight. Additionally, Turek's one-on-one training included operations and performance training specific to the Cessna 421B. There was no indication during the Recurrent coursework and evaluation that Turek had any difficulties with regard to descending, turning, speed, or otherwise controlling the aircraft in the airport environment. Turek was taught Cessna 421B stall speeds, proper engine operation, and fuel management.

In 2005, Turek successfully completed 33 hours of recurrent twin-engine instrument proficiency training with Eugene Littlefield, his instructor at Arr-ow. According to Littlefield's deposition testimony, Turek was already a qualified and proficient twin-engine pilot at that time. In Littlefield's opinion, Turek was always in control of the airplane, displayed good techniques, procedures, and cockpit management, and was a very proficient pilot. Littlefield opined that Turek was a fully trained, safe, competent, and qualified multi-engine pilot.

After completing training at both Arr-ow and Recurrent, Turek flew the subject aircraft for an additional five hours in January 2006 under the observation of Levinson, a partial owner of Hark, which had an ownership interest in HK Golden Eagle. Levinson testified at deposition that the purpose of the observation was for Levinson to observe Turek fly the subject aircraft and to provide the required hours to satisfy his insurance company requirements. At the time of the observation flight, Levinson was a certified flight instructor with an FAA rating as an airline transport pilot. Levinson was certified and rated for single-engine, multi-engine, and instrument flight, as well as an instructor for aircraft, instrument flight, and multi-engine aircraft. Levinson testified at deposition that Turek was a qualified pilot

with many hours of flying experience in a Cessna 421B. The accident aircraft crashed at night while in a landing pattern to land at Palwaukee airport. Much of Turek's in-flight training by Levinson in the accident aircraft was flying the landing traffic pattern in the same location as the crash site." *Waugh*, 2012 IL App (1st) 102653, ¶¶ 9-11.

¶ 19    Levinson testified he had known Turek for five or six years prior to the plane crash and had opportunity to observe Turek's piloting abilities in the context of being his instructor. He instructed him three times in his own (Levinson's) aircraft. He also gave him instruction in the accident aircraft, observing Turek fly to ensure he was familiar with the aircraft:

> "A. [LEVINSON:] Well, actually the time that I spent with [Turek] in the [accident aircraft] was a requirement of the insurance company. He had to fly 5 hours with an instructor pilot and what I did at that time was I already knew his flying experience, is, I just went over the procedures to maintain the engines properly, to use the engines properly, shoot some landings with him.

> I didn't go through all the machinations that I did in the prior years because I didn't think it was necessary. He had just come out of Recurrent Training Center, he was qualified as a pilot in the 421, he went and had numerous hours in Glass [Arr-ow] which was instrument recurrency, and I felt that he was competent, there would be no problem, and I called Gene Littlefield [the flight instructor] and I asked him how he did, and he said he did fine. And so I really didn't have any concerns at the time. I thought that he would be, you know, a fine pilot after all the training he went through. He went through a great deal of training."

¶ 20    Levinson testified that he never observed Turek violating any FAA rules or regulations in regard to piloting or maintenance of the aircraft. Levinson testified that, on the evening of the plane crash, he looked up at the sky and said, "I hope these guys know what they're doing" because it was "kind of a rainy, drizzly night. It wasn't freezing rain at that point, but it could have been at altitude, and I just felt that it was a little bit of a situation that it would take experience to handle." He received a telephone call about 10 minutes later informing him of the plane crash.

¶ 21    Levinson testified that, after his five-hour observation/training flight with Turek, he did not feel Turek was in need of any additional training on the accident aircraft:

> "Q. Based on your observations of Mark Turek after the five hours of whether–I don't want to quibble about the words, whether it's instruction, observation, whatever you want to call it, after your five hours of experience with him, did you feel that he needed any additional training in 920 Mike Charlie?

> A. [LEVINSON:] No.

> Q. Was there anything that you saw that caused you concern about his flying abilities when you were with him during those 5 hours?

> A. No.
> ***

> Q. Okay. But in terms of when you finished your 5 hours of observation of Mr. Turek, did you place any restrictions on Mr. Turek in flying that airplane that you were a half owner of?

> A. No.

Q. Did you place any restrictions on the types of weather that he could fly in?

A. No.

Q. Did you place any restrictions about whether he could fly with passengers or not?

A. No."

¶ 22     Airplanes are rated to fly at various speeds, with each type of aircraft assigned a speed at which it will stall, taking into consideration various factors such as whether the flaps are down or up. The crash at issue apparently occurred due to aircraft stall. Instructor Littlefield testified at deposition that, in his training with Turek, Turek did not show propensity toward slow air speeds. He testified:

"A. [LITTLEFIELD:] Early on we talked about the multiple approaches that we teach, and in that 20 or so hours or more I couldn't give you an estimate of the number of approaches that are a part of this training. And it included all phases of the approaches, even engine failures on the approaches, circle to land, problems in the circle to land, losing visibility in those. Every conceivable concept is part of what we teach. [Turek] didn't show any problems."

¶ 23     According to instructor Littlefield, Turek did not receive training on flying in icing conditions at Arr-ow. Turek also did not view the training video regarding icing at Recurrent.

¶ 24     Raymond Chou, a pilot friend of Turek and Levinson, testified at deposition that Levinson had told him Turek liked to fly fast and preferred a smaller, faster aircraft such as a Baron because it was like a sports car.

¶ 25     The record on appeal includes an affidavit by plaintiff's expert, Marc Fruchter, in which he opines that, based on an evaluation of Turek's flight logbooks, Turek failed to log the three night landings in the previous days that were required under section 61.57(b) of the Federal Aviation Regulations in order for him to properly function as the pilot in command on the accident flight.[4] 14 C.F.R. § 61.57(b) (2006). Specifically, according to Fruchter's review of the logbooks, Turek logged only 1 night flight in the previous 90 days. Fruchter's review of Turek's logbooks also revealed that the accident flight was the first time Turek had

---

[4]Section 61.57(b) of the Federal Aviation Regulations provides:

"(b) *Night takeoff and landing experience.* (1) Except as provided in paragraph (e) of this section, no person may act as pilot in command of an aircraft carrying passengers during the period beginning 1 hour after sunset and ending 1 hour before sunrise, unless within the preceding 90 days that person has made at least three takeoffs and three landings to a full stop during the period beginning 1 hour after sunset and ending 1 hour before sunrise, and–

(i) That person acted as sole manipulator of the flight controls; and

(ii) The takeoffs and landings were performed in an aircraft of the same category, class, and type (if a type rating is required).

(2)The required takeoffs and landings required by paragraph (b)(1) of this section may be accomplished in a flight simulator that is–

(i) Approved by the Administrator for takeoffs and landings, if the visual system is adjusted to represent the period described in paragraph (b)(1) of this section; and

(ii) Used in accordance with an approved course conducted by a training center certificated under part 142 of this chapter." 14 C.F.R. § 61.57(b) (2006).

ever flown a Cessna 421B aircraft at night.[5] Fruchter, of Aviation Consultants, Ltd., also submitted an observations/conclusions/opinions report on behalf of plaintiff. The "Opinions" section reads:

"1. The accident took place during the period identified in the FAR's as night [citation] and Mr. Turek did not meet the requirement [citation] to serve as [pilot in command (PIC)] on the accident flight. Therefore Mr. Turek was negligent in showing himself as PIC on the instrument flight plan for the accident flight.

2. There is no evidence that Mr. Turek had satisfied the requirement [citation] for a biennial flight review and was, therefore, not qualified to serve as PIC on the accident flight. Therefore it was negligent for Mr. Turek to file a flight plan showing himself as PIC for the accident flight or to serve as PIC on that flight.

3. The vast majority of Mr. Turek's multi-engine flight experience was obtained in the B-55 Baron aircraft that he owned. [Citation.] The Baron differs significantly from the Cessna 421B in numerous ways including, but not limited to: pressurization, geared engines, 44% more powerful engines, 49% greater maximum gross takeoff weight, and higher stall speeds for the Cessna. Mr. Turek should have recognized that to accept the left seat[6] for the accident flight without insuring that the individual in the right seat was competent to oversee his flying and to takeover control if necessary would create an unsafe condition.

4. Mr. Turek had logged no flight experience in a Cessna 421B that included night and/or icing conditions–both of which were forecast and encountered on the accident flight. For this reason alone Mr. Turek should have declined to serve as PIC on the accident flight.[7] Failing to insure that a competent and experienced pilot was controlling the aircraft created a very unsafe condition.

5. From the radar data noted above, witness statements, and video of the accident it is apparent that Mr. Turek allowed the airspeed of N920MC[8] to decrease until the aircraft stalled causing a loss of control and impact with the ground.

6. During his training at Recurrent Training Center (RTC) Mr. Turek exhibited a tendency to enter turns too steeply [citation], which would lead to an increased stall speed for the aircraft. This can cause a dangerous condition–especially if the aircraft is flying below the recommended speed for a segment of flight. This condition existed on the accident flight and most likely was the cause of the accident.

7. Mr. Knudson, as an owner of the aircraft, had a duty to insure that Mr. Turek was qualified, current, and proficient to perform the flight before allowing him to fly N920MC on the accident flight. Since Mr. Knudson was aware, or should have been aware, that the flight would operate during the hours of night he should not have allowed a pilot who had no experience in a Cessna 421B at night and was not night

---

[5]The crash at issue occurred on approach to land at 6:29 p.m. Sunset that night was at 5:04 p.m.

[6]The left seat is considered the command seat.

[7]We recognize that, while plaintiff argues repeatedly that Turek had never flown a Cessna 421B aircraft at night, he did complete simulator training at Recurrent and was also found competent in instrument flight by Arr-ow during his "instrument competency check."

[8]The wing number of the accident aircraft was N920MC.

current to fly the accident flight. By allowing this, he was negligent and created a very dangerous condition for the accident flight.

8. Mr. Knudson was not qualified as a Certified Flight Instructor (CFI) [citation] and there was no indication in his logbooks that he had ever received instruction in flying an aircraft from the right seat or supervising another pilot [citation]. By placing himself in the right seat and allowing Mr. Turek to assume the left seat, he created a dangerous condition on the accident flight.

9. Mr. Knudson failed to adequately supervise Mr. Turek or take over the aircraft controls and allowed the airspeed to decay to the point where the aircraft stalled causing the accident. As an owner of the aircraft and the more experienced pilot, Mr. Knudson had ultimate control and responsibility for insuring the safety of the accident flight. Mr. Knudson also lacked instrument and night currency on the date of the accident flight. [Citation.]

10. From the above it is evident that neither Mr. Turek nor Mr. Knudson was qualified to act as PIC on the accident flight.

11. Mr. Howard Levinson was aware that Mr. Turek was to pilot N920MC on the accident flight. [Citation.] As both Mr. Turek's flight instructor and an owner of N920MC, Mr. Levinson had a duty to insure that Mr. Turek was qualified, current, and competent to fly the aircraft on the accident flight. If Mr. Levinson was aware that Mr. Turek was not qualified to serve as PIC on the accident flight he had a duty to insure that Mr. Knudson was qualified to serve as PIC. By failing to do so he failed in his duty to insure a safe flight.

12. Mr. Howard Levinson had serious difficulty during a Cessna 421B training session at RTC in September 2008. [Citation.] His inability to fly a standard approach as part of this training brings into question the value of the five (5) hours he served as Mr. Turek's flight instructor to allow Mr. Turek to qualify under the insurance policy for N920MC.

13. H.K. Golden Eagle, as the registered owner of N920MC, through its principals Mr. Howard Levinson and Mr. Kenneth Knudson, had a duty to insure that a qualified, current, and competent pilot was flying N920MC on the accident flight.

14. Morgan Stanley had no corporate policy either prohibiting or regulating use of private aircraft for company travel. [Citation.] It was known that other employees beside Mr. Turek were flying private aircraft for business purposes. [Citation.] This was negligent and placed the employees, customers, and other passengers on private aircraft used for Morgan Stanley company travel in an unsafe situation.

15. Morgan Stanley was aware of Mr. Turek's use of private aircraft for company travel [citation] and reimbursed Mr. Turek for the expenses incurred for the use of his private aircraft. [Citation.] Additionally, Morgan Stanley was aware of and encouraged Mr. Turek to perform flights in his aircraft for Life Flight because it was good for Morgan Stanley's corporate image. [Citation.]

16. I have flown as an employee for three (3) corporate flight departments, interacted with a number of flight departments based at our Fixed Base Operation (FBO), served as a consultant in the formation of two (2) flight departments, and worked as a consultant in various capacities with several other corporate flight

operations. I also wrote two (2) corporate policies governing employee use of private aircraft for company travel. It is the general custom and practice in corporate aviation and every company that I am familiar with either prohibits the use of private aircraft for company travel or has a specific policy regulating the practice. The policies normally address: aircraft type, passenger limitation, pilot certification, pilot experience, weather conditions, insurance requirements, compliance with FARs, etc. Failure to address these areas creates and inherently unsafe condition.

17. Morgan Stanley had a duty to their employees to promulgate and enforce a comprehensive and effective policy regulating use of private aircraft for business travel. Failure to have an appropriate policy permitted a hazardous and unsafe practice under which Mr. Turek was allowed to transport Mr. Garland and a Morgan Stanley client in an aircraft for which he had inadequate training and experience. Had even a minimal policy been in place prior to this crash, Mr. Turek would not have been permitted to transport an employee and a client in an aircraft for which he was not qualified, current, and had very limited flight experience.

18. For all of the above reasons, Messrs. Turek, Knudson, and Levinson, and Morgan Stanley were negligent by engaging in the above-noted conduct or failing to engage in the above-noted conduct. The negligent acts and omissions by Mark Turek, Kenneth Knudson, Howard Levinson, and Morgan Stanley were all contributing causes to the accident involving N920MC and the death of the four persons onboard, including Scott Garland."

¶ 26    Another of plaintiff's experts, William Lawrence, also noted that Turek's logbooks reflect that Turek had never flown a Cessna 421 model airplane at night. Additionally, Lawrence noted that Turek's last recorded biennial fight review (BFR) was on July 28, 2003, and expired on July 30, 2005.[9] He also noted that Knudson's logbooks do not reflect that Knudson had flown any night flights in the 90 days prior to the crash. Lawrence opined that Turek was not qualified to function as the pilot in command because he lacked the requisite 3 night landings within the previous 90 days, as well as a current BFR. Lawrence also opined that Knudson was also unqualified to function as the pilot in command because he, too, lacked the requisite recent fight experience. Additionally, according to Lawrence, Knudson, as the aircraft owner, "was responsible for ensuring the aircraft was properly manned by qualified flight personnel and should never have allowed the flight to proceed with either Mr. Turek or himself functioning as the pilot in command."

¶ 27    Lawrence averred that, if called at trial, he would express the following opinions:

"1. No material or information has been presented that the material or mechanical condition of N920MC contributed to this crash. The NTSB docket discusses the various mechanical inspections and observations made during the investigation. The findings included engine and propeller examinations that found no anomalies.

2. On January 30, 2006, Mr. Turek was not legally qualified to function as the pilot in command of N920MC. To function as the pilot in command, Mr. Turek

---

[9]Defendant-appellee HK Golden Eagle directs this court to a portion of Turek's Recurrent training paperwork, contained in the record, in which Turek self-reports that the date of his last biennial flight review was October 10, 2004, and a page in the FAA accident report which reflects Turek's "current biennial flight review" as October 2004.

would have to have logged 3 night landings in the previous 90 days. He logged one. Further, his biennial flight review had expired some six months earlier.

3. On January 30, 2006, Mr. Knudson was not legally qualified to function as the pilot in command of N920MC. To function as the pilot in command, Mr. Knudson would have [had] to have flown 6 instrument approaches in the previous 6 months, flown 3 takeoffs and landings in the previous 90 days and logged 3 night landings in the previous 90 days. None of these activities were accomplished.

4. Mr. Knudson was negligent in that he allowed Mr. Turek to occupy the left seat of N920MC and to function as the pilot in command. As the owner of N920MC, Mr. Knudson was responsible to ensure a qualified aircrew was flying the airplane. Either he knew Mr. Turek was not qualified, or he did not check Mr. Turek's qualifications. Either way, he was negligent. Further, he should have known that Mr. Turek was not aeronautically adapted to fly N920MC at night, having never flown a Cessna 421 at night. Even further, he should have factored in the deteriorating weather.

5. Mr. Turek was not aeronautically adapted to fly as the pilot in command of N920MC. Mr. Turek was neither qualified to fly at night nor was he adapted to fly at night in a Cessna 421. He had logged only one night landing in the previous 90 days and had never flown a Cessna 421 at night.

6. Mr. Turek was negligent in that he agreed to fly N920MC as the pilot in command in that he knew he did not have the necessary experience to ensure a safe flight. Pilots are individually responsible for maintaining their currency and Mr. Turek certainly knew his qualifications better than anyone else. By agreeing to function as the pilot in command, he ignored both is inexperience in the Cessna 421 in general and his lack of recent night time as well. He also should have realized that his BFR had expired.

7. During the approach to Palwaukee airport at about 1829 CST, Mr. Turek's workload increased to the point that he reverted to the habit patterns formed in his Beech B55 Baron, N281R. Even in familiar aircraft, the workload increases when conditions such as nighttime and adverse weather conditions are present. Add unfamiliarity with a relatively new aircraft type and the pilot becomes easily overwhelmed. In such cases, the pilot will revert to old habit patterns.

8. Mr. Turek flew a VFT downwind entry to runway 34 and arrived at an abeam position too close to the runway and too slow. The wind was right-gear quartering, blowing N920MC towards the runway and increasing the ground speed. Even if Mr. Turek had panned an appropriate distance from the runway for his abeam position, the wind would have served as a mechanism to place the airplane closer to the runway than desired. Since night vision is limited, especially in poor weather conditions, it would have been very difficult for Mr. Turek to perceive the improper alignment.

9. Mr. Turek either tightened his turn to the point that he entered an approach turn stall, or increased the angle of attack and bank angle to the point that he stalled the aircraft. In either event, Mr. Turek stalled N920MC as he turned for final. More likely than not, Mr. Turek did not recognize the imminent danger posed by his poor approach to landing. Also, he did not want to ask for assistance from the man he was seeking to impress, so he continued the approach, and whether he simply slowed

below stall speed, or pulled the airplane into an approach turn stall, the results were the same.

10. Mr. Knudson was negligent in that he failed to take control of the N920MC when he should have recognized the approach was not being flown as necessary for a successful landing. The only pilot in N920MC with appropriate experience to recognize the danger of the approach that was being flown was Mr. Knudson, the owner of the airplane. Although conversation that occurred in the cockpit will never be known, it is obvious that Mr. Knudson either never took control of the aircraft or did not take control in time to prevent the stall and ensuing crash. Mr. Knudson's experience in the Cessna 421, and his ownership of N920MC, positioned him in a place of responsibility that he did not assume.

11. At the altitude N920MC entered the stall, there was not sufficient time nor altitude to recover from the stall. N920MC stalled well below 1,000 feet AGL, more probably at about 650 feet AGL. (The NTSB docket radar information shows N920MC at about 1200 feet MSL below 85 KIAS; runway 16/34 elevation is 643 feet AGL.)

12. Mr. Levinson was likewise negligent in that he should have known that neither Knudson nor Turek were qualified to function as pilot in command of N920MC. Levinson, as co-owner of N920MC, had an equal responsibility to Knudson to ensure the airplane was properly crewed. Levinson was a Certified Flight Instructor, and as such, clearly understood currency requirements. Having flown with Turek as a 421 checkpilot, he should have known that Turek was not current at night and had never flown a Cessna 421 at night. He also should have checked Turek's logbook for BFR currency. And, with regard to Knudson, he had flown with him many times. He was very knowledgeable concerning the time N920MC had spent in maintenance and should have been well aware that virtually all of Knudson's currency requirements had expired.

13. N920MC crashed because of the combined negligence of Mssrs. Knudson, Turek, and Levinson. The combination of the negligent acts of Knudson, Turek, and Levinson, as discussed in the paragraphs above, was responsible for, and was the cause of the crash of N920MC."

¶ 28    Kyle Lyons, an instructor at Recurrent Training Center, testified at deposition that the training Turek received with him was tailored specifically to a Cessna 421B aircraft. Recurrent provided Turek with a certificate of completion for the flight training. He testified that the pilot students who seek training at Recurrent are experienced pilots. He testified that Turek was an attentive and serious student who showed aptitude and proficiency in the areas covered by the course, including the critical power settings, speed settings and stall speeds for an aircraft in approach and arrival in the landing environment, and instruction regarding the electrical system, power plant, engines, emergency procedures, fuel system and limitations of the Cessna 421B. Reviewing the notes he took during the training, Lyons commented that Turek had needed more full procedure approaches. Lyons testified that Turek demonstrated proficiency in slow flight and stalls. Lyons testified that Turek also received instruction from other instructors at Recurrent, including instruction regarding approaches, and Turek demonstrated diligence, competency, and proficiency in those maneuvers, with nothing to indicate problems with regard to speed or power settings in an

airport environment, problems with speeds or power settings with the gear up or down, or in turns with the gear up or down, and nothing to indicate he was unaware of stall speeds or how to properly manage the engine and fuel. In reviewing notes taken by other flight instructors at Recurrent, Lyons acknowledged that another instructor had noted that Turek entered turns too steeply and that he needed more training on full procedure approaches.

¶ 29    Turek's and Levinson's pilot friend, Raymond Chou, testified that Turek had told him he was interested in having an ownership partnership in the Cessna 421B. Chou testified that he had flown with Turek on 15 to 20 occasions in other airplanes and felt confident in Turek's piloting abilities. Chou explained that Turek normally flew a Baron aircraft, which was smaller, lighter, and more nimble than the Cessna 421B, which is larger and more difficult to maneuver. Turek compared the two airplanes by saying the Cessna 421B was like driving a sport utility vehicle, while the Baron was like driving a sports car. Chou testified that Turek understood the maneuverability differences between the two aircraft. Chou opined that the crash was "a classic case of base to final turn, too slow and the plane stalls." Regarding the possible partnership in the Cessna 421B, Chou testified that Turek felt Levinson might be a "difficult partner to have," and that Levinson had reservations about Turek because he thought Turek liked to fly fast, "kind of like a sports car driver."

¶ 30    William McGuinn testified that he met with Knudson in Kansas after the Cessna 421B landed. McGuinn, who was a real estate agent, drove Knudson to a property approximately 30 minutes away that he thought would make a good Sybaris property. They then went out to lunch together. During that time, Knudson told McGuinn that he brought Turek on the flight so that Knudson could evaluate Turek's flying and make sure he was competent to fly the aircraft. Knudson described to McGuinn a disagreement Turek and Knudson had on takeoff that day, when Knudson thought Turek was piloting the aircraft to climb too steeply after takeoff, that Turek "rotated and climbed out steeply without accelerating to a speed that would have allowed them to climb out safely." Additionally, Knudson told McGuinn that, en route from Chicago to Kansas City, they discovered the landing gear had inadvertently been left down. McGuinn testified that Knudson said he thought Turek's flying skills were not up to par.

¶ 31                    C. Knudson's Competencies
¶ 32    Knudson was an experienced pilot who had logged over 2,000 hours of flying time. He started flying in 1966, received his first private pilot certificate in 1973, and was certified in multi-engine landing in 1974. Knudson had often flown Cessna 421B aircrafts. Starting in 2004, Knudson flew the accident aircraft on a regular basis.

¶ 33                    D. The Motions to Dismiss
¶ 34    Levinson and Hark Corporation filed a motion to dismiss certain claims pursuant to section 2-619 of the Code. They argued, in pertinent part, that (1) the allegations of negligent entrustment against Levinson and Hark Corporation are not supported by the evidence, where there was no evidence that Levinson had any reason to believe that Turek was not sufficiently licensed, trained, or qualified to fly a Cessna 421B aircraft; and (2) the corporate veil should not be pierced and Levinson and HK Golden Eagle should not be treated as one and the same.

¶ 35    HK Golden Eagle filed a motion to dismiss all claims against it pursuant to section 2-619 of the Code[10] arguing, in pertinent part, that (1) HK Golden Eagle is not guilty of negligent entrustment where Turek was well qualified to pilot the Cessna 421B and, even if he were not well qualified, HK Golden Eagle did not know nor should it have known that Turek was an incompetent or unfit pilot; and (2) the evidence does not support HK Golden Eagle being guilty of the negligent supervision of its part-owner Knudson.

¶ 36    Sybaris also filed a motion to dismiss claims of negligent entrustment pursuant to section 2-619 of the Code, arguing, in pertinent part: (1) there is no evidence that Sybaris is vicariously liable for Knudson's actions; and (2) Sybaris is not liable because it did not own the subject aircraft.

¶ 37    Knudson also filed a motion to dismiss claims of negligent entrustment pursuant to section 2-619 of the Code, arguing in pertinent part, that there was insufficient evidence to establish that Knudson was negligent during the flight.

¶ 38    After hearing arguments from the parties, the trial court granted the motions to dismiss. This appeal follows.

¶ 39                                II. ANALYSIS

¶ 40    Due to the complex nature of this consolidated cause, we will consider herein each claim as to each party individually. On appeal, the various parties have adopted portions of other parties' briefs as such: the Levinson defendants incorporate HK Golden Eagle's argument as to the negligent entrustment claims; HK Golden Eagle, in turn, adopts the argument section of the Levinson defendants; the estate of Knudson adopts the arguments submitted by the Levinson defendants and HK Golden Eagle regarding the negligent entrustment claims; HK Golden Eagle adopts the estate of Knudson's argument as to the negligent supervision claim; Sybaris adopts the arguments set forth by the Estate of Knudson, HK Golden Eagle, and the Levinson defendants regarding the negligent supervision claims against Knudson.

¶ 41                          A. The Standard of Review

¶ 42    Initially, we note that, although the motions at issue are motions to dismiss pursuant to section 2-619 of the Code, plaintiff urges us to consider them to be motions for summary judgment. Summary judgment is proper when " 'the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.' " *Palm v. 2800 Lake Shore Drive Condominium Ass'n*, 2013 IL 110505, ¶ 28 (quoting 735 ILCS 5/2-1005(c) (West 2008)); see also *Schultz v. Illinois Farmers Insurance Co.*, 237 Ill. 2d 391, 399 (2010). "Summary judgment is a drastic measure and should only be granted if the movant's right to judgment is clear and free from doubt." *Outboard Marine Corp. v. Liberty Mutual Insurance Co.*, 154 Ill. 2d 90, 102 (1992). In determining whether the moving party is entitled to summary judgment, the court must construe the pleadings and evidentiary material

---

[10]HK Golden Eagle filed its motion pursuant to section 2-619 of the Code on February 28, 2011, titling the motion "HK Golden Eagle Inc's Motion to Dismiss Under 735 ILCS 5/2-619." The cover page to the exhibits to the motion, also filed February 28, 2011, however, is titled, "Joint Exhibits for HK Golden Eagle Inc's Motion for Summary Judgment and Motion to Dismiss Under 735 ILCS 5/2-619."

in the record strictly against the moving party. *Happel v. Wal-Mart Stores, Inc.*, 199 Ill. 2d 179, 186 (2002). "Although the burden is on the moving party to establish that summary judgment is appropriate, the nonmoving party must present a *bona fide* factual issue and not merely general conclusions of law." *Morrissey v. Arlington Park Racecourse, LLC*, 404 Ill. App. 3d 711, 724 (2010) (citing *Caponi v. Larry's 66*, 236 Ill. App. 3d 660, 670 (1992)). "A genuine issue of material fact exists where the facts are in dispute or where reasonable minds could draw different inferences from the undisputed facts." *Morrissey*, 404 Ill. App. 3d at 724 (citing *In re Estate of Ciesiolkiewicz*, 243 Ill. App. 3d 506, 510 (1993), and *Espinoza v. Elgin, Joliet & Eastern Ry. Co.*, 165 Ill. 2d 107, 114 (1995)). We review the circuit court's decision to grant or deny a motion for summary judgment *de novo*. *Palm*, 2013 IL 110505, ¶ 28; see also *Kajima Construction Services, Inc. v. St. Paul Fire & Marine Insurance Co.*, 227 Ill. 2d 102, 106 (2007).

¶ 43    Plaintiff acknowledges that the defendants all sought relief under section 2-619 of the Code rather than pursuant to a motion for summary judgment, but she argues that such an election is a "distinction without a difference." However, defendants elected to seek relief under section 2-619 of the Code, the trial court considered and ruled upon those motions under section 2-619 of the Code, and we, too, review this cause under section 2-619 of the Code.

¶ 44    A section 2-619 motion to dismiss admits the sufficiency of the complaint, but asserts an affirmative matter that acts to defeat the claim. *Patrick Engineering, Inc. v. City of Naperville*, 2012 IL 113148, ¶ 31; *King v. First Capital Financial Services Corp.*, 215 Ill. 2d 1, 11-12 (2005); *Wallace v. Smyth*, 203 Ill. 2d 441, 447 (2002); see 735 ILCS 5/2-619(a)(9) (West 2010) (allowing dismissal when "the claim asserted against defendant is barred by other affirmative matter avoiding the legal effect of or defeating the claim"). The question on review is whether a genuine issue of material fact precludes dismissal or whether dismissal is proper as a matter of law. *Fuller Family Holdings, LLC v. Northern Trust Co.*, 371 Ill. App. 3d 605, 613 (2007). When ruling on a motion to dismiss, a reviewing court must construe the pleadings and supporting documents in the light most favorable to the nonmoving party and accept as true all well-pleaded facts in the complaint and all inferences that may reasonably be drawn in the plaintiff's favor. *Sandholm v. Kuecker*, 2012 IL 111443, ¶ 55. Disputed issues of fact are reserved for trial proceedings. *Advocate Health & Hospitals Corp. v. Bank One, N.A.*, 348 Ill. App. 3d 755, 759 (2004). "Under section 2-619, the defendant admits to all well-pled facts in the complaint, as well as any reasonable inferences which may be drawn from those facts [citation], but asks the court to conclude that there is no set of facts which would entitle the plaintiff to recover. [Citation.] As long as there is no genuine issue of material fact and the defendant is entitled to judgment as a matter of law, the complaint may be properly dismissed." *Advocate Health & Hospitals Corp.*, 348 Ill. App. 3d at 759. The circuit court's decision to grant such a motion will be reviewed *de novo*. *Sandholm*, 2012 IL 111443, ¶ 55.

¶ 45                    B. Common Argument Regarding the Previous Decisions

¶ 46    We first address an argument common to all defendants, that is, that this court previously determined that Turek was an experienced pilot who was not at fault in the crash. HK Golden Eagle argues that "this Court has twice addressed Turek's experience and qualifications" and, thus, should not now consider whether plaintiff has sufficiently stated a claim for negligent

entrustment which assumes that Turek was incompetent or reckless with the accident aircraft. The Levinson defendants, the estate of Knudson, and Sybaris join HK Golden Eagle in this argument. Additionally, HK Golden Eagle cites to *Radwill v. Manor Care of Westmont, IL, LLC*, 2013 IL App (2d) 120957, and argues that the standard of review in this cause is governed by the law-of-the-case doctrine, which bars relitigation of an issue previously decided in the same case. HK argues that plaintiff cannot now raise and rely upon "factual characterizations that contradict this Court's prior findings" as to Turek's qualifications as a pilot. The Levinson defendants, the estate of Knudson, and Sybaris join HK Golden Eagle in this argument. The specific statement with which the parties are concerned is:

> "As we noted in a previous decision regarding this same aircraft crash, Turek was an experienced, licensed private pilot, and specifically qualified to fly multi-engine aircraft:
>
>> 'Prior to January 2006, Turek was fully licensed by the Federal Aviation Administration (FAA) to fly twin-engine aircraft, including the accident aircraft. From January 6 through January 9, 2006, Turek completed a flight training course with Recurrent to transition from his Baron B55 twin-engine plane to the Cessna 421B. Previous to taking this course, Turek had 1,284.05 hours of total flight experience, including over 1,050 hours in multi-engine aircraft. Turek had piloted a Cessna 421B aircraft for over 29 hours. At the time he completed the Recurrent course, Turek had been an FAA-licensed pilot for nine years. There is no argument made that Turek was not properly qualified to pilot the subject aircraft under FAA regulations.' *Waugh v. Morgan Stanley & Co.*, 2012 IL App (1st) 102653, ¶ 7." *Garland*, 2013 IL App (1st) 112121, ¶ 9.

¶ 47    We wish to be absolutely clear here: this quote the defendants have taken from the prior two opinions issued by this court in this matter does not determine the issue now before us. Neither previous case dealt with the same issues as are presented in the instant case. Additionally, the statement in *Garland* was merely part of the background facts provided in connection with our decision regarding the application of the dual capacity doctrine in the context of the exclusive remedy provision of the Illinois Workers' Compensation Act (820 ILCS 305/1 *et seq*. (West 2010)). *Garland*, 2013 IL App (1st) 112121, ¶ 9. In the other case, *Waugh*, which language was quoted in *Garland*, this court dealt with the question of whether the tort of educational malpractice was cognizable in Illinois and found it was not. *Waugh*, 2012 IL App (1st) 102653, ¶ 48. Again, the quoted language was merely a part of the background facts in the opinion and not an issue resolved by this court. Moreover, even taking this quoted text to its limit, it states that Turek was an FAA-licensed pilot and had taken courses to transition from his Baron to the Cessna 421B. The parties in the instant case do not dispute these particular facts, but plaintiff argues instead that it was not reasonable to entrust the Cessna 421B to Turek in light of particular evidence now before the court. This issue has not been previously decided.

¶ 48    C. The Levinson Defendants and HK Golden Eagle

¶ 49    1. Negligent Entrustment

¶ 50    Plaintiff first contends that the trial court erred in dismissing her complaint against the Levinson defendants where: (1) there was no evidence to support a case for negligent

entrustment of the Cessna 421 against Levinson; and (2) there was no basis to dismiss based on the corporate veil doctrine. The Levinson defendants and HK Golden Eagle have adopted one another's arguments as to the issue of negligent entrustment.

¶ 51 In her ninth amended complaint, plaintiff alleged, in pertinent part, that Levinson, individually and as agent of Hark, was guilty of the following conduct:

"14. On and before January 30, 2006, and at all times mentioned herein, Defendant, LEVINSON, Individually, and/or as an authorized owner, agent, apparent agent and/or employee of H.K. GOLDEN EAGLE, INC. and/or Defendant HARK, was negligent in one or more of the following respects:

a. failed to properly inspect, maintain, repair and overhaul the aircraft, engines and component parts;

b. failed to properly teach, train and instruct MARK TUREK how to perform proper and adequate pre-flight preparation and inspection so as to ensure a safe flight and landing on the aircraft;

c. failed to properly teach, train and instruct MARK TUREK how to plan, utilize and engage in proper communications and coordination of responsibilities between co-pilots;

d. failed to properly teach, train and instruct MARK TUREK how to competently and safely operate the aircraft so as to ensure a safe landing;

e. failed to properly teach, train and instruct MARK TUREK how to engage in and execute safe approach and landing maneuvers;

f. failed to properly teach, train and instruct MARK TUREK how to maintain proper control over the aircraft so as to maintain its flight path;

g. failed to properly teach, train and instruct MARK TUREK how to properly monitor engine and aircraft performance during flight so as to prevent a crash of the aircraft;

h. failed to properly teach, train and instruct MARK TUREK how to provide and utilize proper instructions and communications between co-pilots to ensure safe flight;

i. failed to properly teach, train and instruct MARK TUREK how to properly respond to and compensate for engine failure and malfunction of the aircraft so as to avoid a crash;

j. failed to properly teach, train and instruct MARK TUREK how to engage in and execute proper emergency maneuvers so as to prevent a crash of the aircraft;

k. allowed MARK TUREK to operate the aircraft when he knew or should have known that he did not have sufficient training, experience, or competency to do so safely;

l. failed to inform Mark Turek that he did not have adequate experience, skills and competency to safely operate the Cessna 421B aircraft;

m. failed to inform Kenneth Knudson that Mark Turek did not have adequate experience, skills and competency to safely operate the Cessna 421B aircraft;

n. allowed mark Turek to operate the Cessna 421B aircraft with non-pilot passengers on board when Levinson knew or should have known that Turek did not have adequate training, experience or competency to do so safely; and

o. was otherwise negligent."[11]

¶ 52　　"To succeed in an action for negligence, a plaintiff must prove facts that establish the existence of a duty, a breach of the duty, and an injury to the plaintiff which was proximately caused by the breach." *Hills v. Bridgeview Little League Ass'n*, 195 Ill. 2d 210, 228 (2000) (citing *Cunis v. Brennan*, 56 Ill. 2d 372, 374 (1974)). A duty analysis begins with the "question of whether the defendant, by his act or omission, contributed to a risk of harm to this particular plaintiff." *Simpkins v. CSX Transportation, Inc.*, 2012 IL 110662, ¶ 21. Then, the touchstone of a duty analysis is to ask whether the plaintiff and the defendant stood in such a relationship to one another that the law imposes on the defendant an obligation of reasonable conduct for the benefit of the plaintiff. The inquiry involves four factors: (1) the reasonable foreseeability of the injury; (2) the likelihood of the injury; (3) the magnitude of the burden of guarding against the injury; and (4) the consequences of placing the burden on the defendant. *Simpkins*, 2012 IL 110662, ¶ 18; *Krywin v. Chicago Transit Agency*, 238 Ill. 2d 215, 226 (2010); *Marshall v. Burger King Corp.*, 222 Ill. 2d 422, 436-37 (2006) (in ordinary negligence action, court stated "[t]he touchstone of this court's duty analysis is to ask whether a plaintiff and a defendant stood in such a relationship to one another that the law imposed upon the defendant an obligation of reasonable conduct for the benefit of the plaintiff").

¶ 53　　To prove negligent entrustment, a party must show that "the defendant gave another express or implied permission to use or possess a dangerous article or instrumentality that the defendant knew, or should have known, would likely be used in a manner involving an unreasonable risk of harm." *Northcutt v. Chapman*, 353 Ill. App. 3d 970, 974 (2004); *Zedella v. Gibson*, 165 Ill. 2d 181, 186 (1995) (in Illinois, negligent entrustment is defined as "entrusting a dangerous article to another whom the lender knows, or should know, is likely to use it in a manner involving an unreasonable risk of harm to others" (internal quotation marks omitted)).

¶ 54　　In *Evans v. Shannon*, our supreme court considered a situation where the parents of a driver killed in a collision with an intoxicated employee of a car detailer brought wrongful-death and survivor actions against the detailer, its employee, and the car dealer who hired the detailer to clean the car. *Evans v. Shannon*, 201 Ill. 2d 424, 427 (2002). The plaintiffs' action against the defendant dealer, Vogler Motor Company, which had contracted with the detailer whose employee removed the car without permission and caused the fatal crash, was based, in pertinent part, on a theory of negligent entrustment. *Evans*, 201 Ill. 2d at 427. A jury found all three defendants liable, and Vogler appealed his liability finding.

---

[11]Plaintiff admits paragraphs 12(b), (c), (d), (e), (f), (g), (h), (i), and (j) were stricken pursuant to court orders of July 19, 2010, and August 5, 2010, as these counts relate to the tort of educational malpractice, a tort that, in *Waugh v. Morgan Stanley & Co.*, 2012 IL App (1st) 102653, this court determined is noncognizable in Illinois. Nonetheless, plaintiff posits, "[d]espite that fact, the above-quoted training allegations are not irrelevant to the issues in the case at bar, because they relate equally to Levinson's knowledge of Turek's deficiencies in flying this type of aircraft, and therefore to his negligence in allowing him to do so."

*Evans*, 201 Ill. 2d at 427. Finding that Vogler's motions for directed verdict and judgment notwithstanding the verdict were improperly denied, our supreme court reversed the judgment of the circuit court as it pertained to Vogler. *Evans*, 201 Ill. 2d at 427. In so doing, the court explained:

> "In order to prove negligent entrustment, plaintiffs must show that Vogler gave another express or implied permission to use or possess a dangerous article or instrumentality which Vogler knew, or should have known, would likely be used in a manner involving an unreasonable risk of harm to others. See *Norskog v. Pfiel*, 197 Ill. 2d 60, 84-85 (2001); *Zedella v. Gibson*, 165 Ill. 2d 181, 186 (1995); see Restatement (Second) of Torts § 308 (1965). Although an automobile is not a dangerous instrumentality *per se*, it may become one if it is operated by someone who is incompetent, inexperienced or reckless. *Eyrich v. Estate of Waldemar*, 327 Ill. App. 3d 1095, 1098 (2002).
>
> There are two primary considerations in negligent-entrustment analysis: (1) whether the owner of the vehicle entrusted the car to an incompetent or unfit driver, and (2) whether the incompetency was a proximate cause of a plaintiff's injury. *Taitt v. Robinson*, 266 Ill. App. 3d 130, 132 (1994). In turn, proximate cause consists of two distinct elements: cause in fact and legal cause. *First Springfield Bank & Trust v. Galman*, 188 Ill. 2d 252, 257-58 (1999); see *Watson v. Enterprise Leasing Co.*, 325 Ill. App. 3d 914, 922 (2001). As this court stated in *First Springfield Bank & Trust*:
>
>> 'Cause in fact exists where there is a reasonable certainty that a defendant's acts caused the injury or damage. [Citation.] A defendant's conduct is a cause in fact of the plaintiff's injury only if that conduct is a material element and a substantial factor in bringing about the injury. [Citation.] A defendant's conduct is a material element and a substantial factor in bringing about an injury if, absent that conduct, the injury would not have occurred. [Citation.] "Legal cause," by contrast, is essentially a question of foreseeability. [Citation.] The relevant inquiry here is whether the injury is of a type that a reasonable person would see as a likely result of his or her conduct.' *First Springfield Bank & Trust*, 188 Ill. 2d at 258." *Evans*, 201 Ill. 2d at 434-35.

¶ 55    Our supreme court then went on to analyze whether the Vogler personnel knew, or should have known, that the driver for the detailer was an unlicensed or incompetent driver, and determined that Vogler neither knew nor had reason to know. *Evans*, 201 Ill. 2d at 435. The court rejected plaintiffs' argument that Vogler had an additional duty to check on the employee's driver's license status, stating: "We hold, unless a customer knows, or has reason to know, that an employee of the contractor is unlicensed, incompetent or reckless, the customer has no duty of further inquiry." *Evans*, 201 Ill. 2d at 437.

¶ 56    Like an automobile, an airplane is not inherently dangerous, but may become so if operated by a pilot who is incompetent, inexperienced, or reckless. See *Evans*, 201 Ill. 2d at 434. Although the *Evans* case revolves around an automobile accident, there is a dearth of negligent entrustment cases involving airplanes in Illinois, and we find the reasoning in *Evans* persuasive here.

¶ 57    In the case at bar, construing all pleadings, supporting documents, and reasonable inferences in plaintiff's favor, as we must on a motion to dismiss pursuant to section 2-619 of the Code (*Sandholm*, 2012 IL 111443, ¶ 55), we find that genuine issues of material fact exist

- 20 -

in plaintiff's claim alleging negligent entrustment against defendant Levinson such that the trial court erred in dismissing this claim. See *Advocate Health & Hospitals Corp.*, 348 Ill. App. 3d at 759 ("As long as there is no genuine issue of material fact and the defendant is entitled to judgment as a matter of law, the complaint may be properly dismissed."). Specifically, plaintiff sufficiently pled that Levinson was negligent in entrusting his Cessna 421B to Turek to fly with other passengers on board when he was aware of Turek's deficiencies with respect to the operation of this particular aircraft. Turek had never flown the plane with non-pilot passengers, may have lacked his biennial certification, and lacked the requisite 3 night landings in the prior 90 days in order to properly fly and land at night. Testimony shows that Levinson had reservations about Turek because he thought Turek liked to fly fast, "kind of like a sports car driver." Levinson knew that Turek was more accustomed to flying his smaller, lighter, more maneuverable Baron aircraft, and he knew that, for the first time, Turek would be flying a plane which he was learning to fly with non-pilot passengers on a winter flight. Construing plaintiff's arguments in the light most favorable to the plaintiff, we find there are genuine issues of material fact regarding Turek's flying abilities and what Levinson knew about them, such that this cause should be presented to a finder of fact. See *Advocate Health & Hospitals Corp.*, 348 Ill. App. 3d at 759 (disputed issues of fact are reserved for trial proceedings).

¶ 58 We note here that, under this analysis, Levinson was not required to investigate Turek's qualifications and abilities just by virtue of the fact that Turek was going to fly the airplane. Rather, his duty of further inquiry flowed from the fact that Levinson *had reason to know* Turek may have been incompetent or reckless. See, *e.g.*, *Evans*, 201 Ill. 2d at 437 ("We hold, unless a customer knows, or has reason to know, that an employee of the contractor is unlicensed, incompetent or reckless, the customer has no duty of further inquiry.").

¶ 59 We next consider whether, taking the pleadings and reasonable inferences drawn therefrom as true, there is a question of fact which would preclude dismissal as to whether Turek's incompetency was a proximate cause of plaintiff's injury. See, *e.g.*, *Evans*, 201 Ill. 2d at 434 ("There are two primary considerations in negligent-entrustment analysis: (1) whether the owner of the vehicle entrusted the car to an incompetent or unfit driver, and (2) whether the incompetency was a proximate cause of a plaintiff's injury.").

¶ 60 HK Golden Eagle admits, and the Levinson defendants join, "[t]o be clear, the Cessna crashed while it was flying 'low and slow'; if this situation was brought about by Turek's piloting then his landing approach was arguably negligent" but it argues, "[b]ut even competent pilots commit negligent acts. Negligence is an act, whereas (in)competence is a characteristic." In our estimation, in the context of a motion to dismiss pursuant to section 2-619 of the Code, this difference does not make the case. Instead, again taking the pleadings and reasonable inferences as true, we find that the reasonable foreseeability of the injury was arguably high if Turek, as alleged, was a pilot inexperienced in a Cessna 421B aircraft, flying for the first time with nonpilot passengers on a wintry night, who had a history of flying fast like a sports car driver, and lacked the requisite previous night landings in order to properly fly and land at night. Additionally, the likelihood of injury from a plane crash is certainly high. Both the magnitude of the burden of guarding against the injury and the consequences of placing the burden on defendant are low, as Levinson needed only to inquire further as to Turek's abilities or not allow Turek to fly this particular flight.

¶ 61     Levinson and HK Golden Eagle argue that, because nobody knows for sure what happened in the cockpit of the Cessna, it is impossible to prove that Turek's flying deficiencies were the cause in fact of the injury. However, because we are here reviewing a motion to dismiss, we are required to draw inferences in favor of plaintiff. See *Sandholm*, 2012 IL 111443, ¶ 55 (when ruling on a motion to dismiss, a reviewing court must construe the pleadings and supporting documents in the light most favorable to the nonmoving party and accept as true all well-pleaded facts in the complaint and all inferences that may reasonably be drawn in the plaintiff's favor). Here, plaintiff has pled, in part, that while Turek may well have been an excellent pilot in his Baron aircraft, he was not sufficiently skilled in flying a plane like the Cessna 421B to be safely or reasonably entrusted with it, and it was negligent for Levinson to so entrust him. She has pled that Turek was known to fly like a sports car driver; that he was accustomed to flying a much lighter, more maneuverable aircraft; that, according to the NTSB, the crash was probably caused by "the pilot's failure to maintain airspeed during the landing approach which led to an inadvertent stall and subsequent uncontrolled descent and impact with the ground"; and that the examination of the Cessna performed by the NTSB found that the engines and propellers revealed no anomalies that existed prior to impact. Taking these pleadings and the inferences reasonably drawn therefrom as true, we are unable to conclude that there is no set of facts which would entitle the plaintiff to recover. Accordingly, we find that the trial court erred in dismissing this claim pursuant to section 2-619 of the Code.

¶ 62                           2. Piercing the Corporate Veil

¶ 63     Plaintiff also contends that the corporate veil doctrine does not support dismissal of this case. She argues that Levinson was personally negligent and "therefore can be held accountable for his actions regardless of whether or not he also was acting on behalf of HK Golden Eagle," and that "Levinson personally engaged in negligent conduct by entrusting the Cessna to Turek when, because of his own experience in flying with him, and his efforts to instruct him, he had reason to doubt, and in fact did doubt, Turek's ability to safely make this flight. Such negligent conduct constitutes direct negligence by Levinson individually (and as an agent of Hark Corporation), regardless of whether or not he is an officer or shareholder of HK Golden Eagle."

¶ 64     The Levinson defendants do not respond to this argument. A reviewing court is entitled to have the issues on appeal clearly defined with pertinent authorities cited and a cohesive legal argument presented. *Thrall Car Manufacturing Co. v. Lindquist*, 145 Ill. App. 3d 712, 719 (1986). Illinois Supreme Court Rule 341(h)(7) (eff. Feb. 6, 2013) provides: "Points not argued are waived and shall not be raised in the reply brief, in oral argument, or on petition for rehearing." This rule applies to appellees as well as appellants. *Vancura v. Katris*, 238 Ill. 2d 352, 372 (2010). Accordingly, the Levinson defendants have waived this issue and we will not address it here.

¶ 65                           D. The Estate of Knudson
¶ 66                           1. Negligent Entrustment
¶ 67     The estate of Knudson also joins with HK Golden Eagle and the Levinson defendants regarding the negligent entrustment issue. Because Knudson's involvement was different

- 22 -

than that of Levinson, as Knudson actually perished in the plane crash, we address this argument separately even though he does not. Sybaris adopts Knudson's arguments against negligent entrustment, arguing, "Sybaris's agent, Knudson, is not liable as a matter of law for *** negligent entrustment given the facts in the record and for the reasons set forth in the defendants-appellees' briefs. There is ample speculation but insufficient facts showing any negligent acts or omissions by Knudson. It follows that no liability for negligent entrustment *** can be imputed from Knudson to his alleged principal, Sybaris."[12]

¶ 68        Plaintiff's ninth amended complaint alleged that Knudson failed to plan, utilize and engage in proper communications and coordination of responsibilities between co-pilots; failed to properly and safely operate the aircraft so as to ensure a safe landing; failed to engage in and execute safe approach and landing maneuvers; failed to maintain proper control over the aircraft so as to maintain its flight path; failed to properly monitor engine and aircraft performance during the flight so as to prevent a crash of the aircraft; failed to provide and utilize proper instructions and communications between co-pilots to ensure a safe flight; failed to properly respond to and compensate for engine failure and malfunction of the aircraft so as to avoid a crash; failed to engage in and execute proper emergency maneuvers so as to prevent a crash of the aircraft; failed to engage in proper communications with Mark Turek to ensure safe flight; failed to properly and timely assist Turek in the safe operation of the aircraft; failed to properly and timely inform Turek of the icing conditions; failed to take over control of the aircraft during emergency circumstances; failed to safely land the aircraft; failed to properly execute the duties of pilot in command; failed to properly evaluate adverse weather conditions; attempted to land the aircraft when weather and flight conditions rendered it unsafe to do so; permitted Turek to attempt to land the aircraft when weather and flight conditions rendered it unsafe to do so; and was otherwise negligent.

¶ 69        The record established that Knudson and Howard Levinson owned the Cessna 421B aircraft via their interest in HK Golden Eagle. Sybaris had purchased the aircraft in August 2004, and in May 2005, the airplane registration was transferred to HK Golden Eagle. At the time of the fatal flight, Knudson and Levinson were considering bringing Turek in as a partner in the aircraft.

¶ 70        In addition to all of the facts we discussed above regarding negligent entrustment, Knudson was onboard the flight the night of the crash. Deposition testimony from William McGuinn, with whom Knudson met when the plane landed in Kansas, shows that Knudson was uncomfortable with Turek's flying. Specifically, McGuinn testified that Knudson told him he brought Turek on the flight so that Knudson could evaluate Turek's flying and make sure he was competent to fly the aircraft. Knudson did not like how Turek had flown the aircraft on takeoff from Chicago that day. McGuinn testified that Knudson described to him a disagreement Turek and Knudson had when Knudson thought Turek was piloting the airplane to climb too steeply after takeoff, saying that Turek "rotated and climbed out steeply without accelerating to a speed that would have allowed them to climb out safely." In addition, Knudson told McGuinn that, partway between Chicago and Kansas, they had discovered that Turek had inadvertently left the landing gear down. McGuinn testified that Knudson said he thought Turek's flying skills were not up to par. Additionally, Knudson was

_____

[12]Additionally, Sybaris urges independent reasons for which it should not be held liable. We address those arguments in a separate section below.

at the airport in Kansas and likely knew about the weather, and yet he allowed Turek, a pilot whose flying skills he did not think were up to par, to fly passengers in his plane on a dark, wintry night. Plaintiff alleged that Knudson should have known Turek was not competent to fly this particular flight on this particular night and should not have entrusted the plane to him. All of this, in addition to the reasons outlined in our discussion of negligent entrustment as to the other parties, is enough to withstand a motion to dismiss pursuant to section 2-619 of the Code.

¶ 71                                    2. Negligent Supervision

¶ 72      Next, plaintiff contends that the trial court erred in dismissing her claim of negligent supervision against the estate of Knudson. Specifically, she argues that she sufficiently pled a viable negligent supervision theory that precluded dismissal of this case where a reasonable jury could conclude that Knudson was negligent when he failed to adequately supervise Turek or take over the controls of the aircraft during the fatal flight. The estate of Knudson disagrees, arguing that he had no duty to supervise Turek. HK Golden Eagle adopts the estate of Knudson's argument regarding this issue. Sybaris also adopts Knudson's arguments against negligent supervision, arguing, "Sybaris's agent, Knudson, is not liable as a matter of law for negligent supervision *** given the facts in the record and for the reasons set forth in the defendants-appellees' briefs. There is ample speculation but insufficient facts showing any negligent acts or omissions by Knudson. It follows that no liability for *** negligent supervision *** can be imputed from Knudson to his alleged principal, Sybaris."[13]

¶ 73      Initially, the estate of Knudson contends that plaintiff waived this issue, as she did not specifically address in her opening brief the fact that the trial court, when dismissing the claim, found that Knudson had no duty to supervise Turek. At the hearing on the motion to dismiss, the trial court explained that nobody could know for sure what was happening in the cockpit of the airplane at the time of the crash and, therefore, there was no evidence to support a claim of negligent supervision. Additionally, even if there were evidence to support such claim, the trial court said, Knudson had no duty to so supervise. Specifically, the trial court stated:

> "THE COURT: There are no facts that would support the negligent supervision, and if there were, there is no duty on behalf of Mr. Knudson at the time of that flight with regard to supervision. There's no legal duty on his part. Had he voluntarily undertaken a duty, he could have abandoned that duty at any time."

¶ 74      The trial court then entered an order granting the motion to dismiss. It did not include its reasoning in the written order. Plaintiff appealed from that order. "It is the judgment that is on appeal to a court of review and not what else may have been said by the lower court." *Ultsch v. Illinois Municipal Retirement Fund*, 226 Ill. 2d 169, 192 (2007). The order being appealed here is the granting of the motion to dismiss, not the trial court's underlying reasoning. Plaintiff has not waived this issue.

¶ 75      In order to withstand this motion to dismiss, plaintiff, in her cause of action for negligence, must allege sufficient facts to establish the existence of a duty of care owed by the defendant to the plaintiff, a breach of the duty, and an injury proximately caused by the

---

[13]Additionally, Sybaris urges independent reasons for which it should not be held liable. We address those arguments in a separate section below.

breach. *Bajwa v. Metropolitan Life Insurance Co.*, 208 Ill. 2d 414, 421 (2004). Whether a duty exists is a question of law for the court to decide. *Bajwa*, 208 Ill. 2d at 422. Whether the duty was breached and whether the breach was a proximate cause of the plaintiff's injuries are questions of fact for a jury to decide. *Bajwa*, 208 Ill. 2d at 422. Ordinarily, a person has no affirmative duty to protect another from harmful or criminal acts by third persons. *Hills v. Bridgeview Little League Ass'n*, 195 Ill. 2d 210, 228 (2000). Exceptions to this general principal include: (1) when the parties are in a "special relationship," *i.e.* common carrier-passenger, innkeeper-guest, business invitor-invitee, or voluntary custodian-protectee, and the harmful or criminal acts were reasonably foreseeable; (2) when an employee is in imminent danger and this is known to the employer; (3) when a principal fails to warn an agent of an unreasonable risk of harm involved in the agency; and (4) when there is negligence in the performance of a voluntary undertaking. *Petersen v. U.S. Reduction Co.*, 267 Ill. App. 3d 775, 779 (1994). The voluntary-undertaking exception is at issue here, as plaintiff contends the record, read in the light most favorable to the plaintiff, "is sufficient to permit a jury to find that Knudson had voluntarily undertaken to supervise Turek's flying on that day."

¶ 76    Section 324A of the Restatement (Second) of Torts provides for limited liability to third persons based on the negligent performance of a service or undertaking where the provision of services results in physical harm. *Vancura*, 238 Ill. 2d at 382 n.6. Section 324A provides:

> "One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of a third person or his things, is subject to liability to the third person for physical harm resulting from his failure to exercise reasonable care to protect his undertaking, if
>
> (a) his failure to exercise reasonable care increases the risk of such harm, or
>
> (b) he has undertaken to perform a duty owed by the other to the third person, or
>
> (c) the harm is suffered because of reliance of the other or the third person upon the undertaking." Restatement (Second) of Torts § 324A (1965).

¶ 77    A duty analysis begins with the "question of whether the defendant, by his act or omission, contributed to a risk of harm to this particular plaintiff." *Simpkins*, 2012 IL 110662, ¶ 21. Then, the touchstone of a duty analysis is to ask whether the plaintiff and the defendant stood in such a relationship to one another that the law imposes on the defendant an obligation of reasonable conduct for the benefit of the plaintiff. The inquiry involves four factors: (1) the reasonable foreseeability of the injury; (2) the likelihood of the injury; (3) the magnitude of the burden of guarding against the injury; and (4) the consequences of placing the burden on the defendant. *Simpkins*, 2012 IL 110662, ¶ 18; *Krywin*, 238 Ill. 2d at 226; *Burger King*, 222 Ill. 2d at 436-37 (in ordinary negligence action, court stated "[t]he touchstone of this court's duty analysis is to ask whether a plaintiff and a defendant stood in such a relationship to one another that the law imposed upon the defendant an obligation of reasonable conduct for the benefit of the plaintiff").

¶ 78    Initially, plaintiff urges us to find that a particular statement allegedly made by Levinson after the plane crash constitutes a judicial admission and creates the existence of a special duty owed by Knudson to Turek. Specifically, Levinson apparently responded to a reporting Illinois State Police officer at the scene of the crash that Turek was interested in becoming a co-owner of the airplane and was piloting the aircraft under Knudson's supervision. At his

deposition, Levinson admitted to having had a "similar" conversation with the police, but explained that he did not precisely mean Knudson was supervising Turek:

"Q. When you say that [Knudson] was supervising [Turek], in that sense did you mean supervising or owning to become a partner?

A. [LEVINSON:] My word supervising may not have been absolutely correct at the time. The whole purpose was [for] Ken to see how he handled the controls of the airplane, whether he was rough. In other words, if you move the throttle like that as opposed to slowly that's a no-no. So these are the things that Ken would be watching because I had made that clear to Ken in our initial flights that you have to be very slow with your movement of the throttles. So observing would be better than supervising.

Q. What you're describing that moving the throttle quickly, that's something that may cause that damage to the engine over long term?

A. Yes, or taking–or chopping the throttle quickly."

Plaintiff argues that Levinson's statement to the police was a judicial admission and, as such, is a "binding admission that cannot be retreated from in these proceedings." "A judicial admission is a (1) deliberate, (2) clear, (3) unequivocal, (4) statement of a party, (5) about a concrete fact, (6) within that party's peculiar knowledge. *Hansen v. Ruby Construction Co*. (1987), 155 Ill. App. 3d 475, 508 N.E.2d 301. *** 'A judicial admission is conclusive upon the party making it; it may not be controverted at trial or on appeal. Judicial admissions are not evidence at all but rather have the effect of withdrawing a fact from contention.' (M. Graham, Evidence Text, Rules, Illustrations and Problems, at 146 (1983) (hereinafter cited as Graham).)" *Brummet v. Farel*, 217 Ill. App. 3d 264, 266-67 (1991).

¶ 79    This "admission" by Levinson is not a judicial admission. It was not made under oath, but was made at the scene of the crash to a State Police officer investigating the scene; it was not deliberate, it was not clear, and it was certainly not unequivocal, as Levinson later clarified himself, explaining that he meant observation rather than supervision.

¶ 80    Plaintiff urges us, then, to consider the statement an evidentiary admission. An evidentiary admission "may be controverted or explained by the party. Evidentiary admissions may be made in, among other things, pleadings in a case other than the one being tried, pleadings that have been superseded or withdrawn, answers to interrogatories, and other statements made pursuant to Federal Rule of Evidence 801(d)(2) (Fed. R. Evid. 801(d)(2)). Graham at 146." *Brummet*, 217 Ill. App. 3d at 267.

¶ 81    Even assuming this statement could come in, however, plaintiff still fails to show that, if this issue went to trial, she could possibly prevail in her claim for negligent supervision where defendant owed no duty to plaintiff. There is nothing in the record that could be read to show that Knudson and Garland were in a relationship such that Knudson would owe a duty to Garland. First, even if Levinson's statement came in that Knudson was supervising Garland, this statement was not under oath and would likely be considered a misstatement, as Levinson's further explanations would come in, as well. Specifically, Levinson would explain that, rather than "supervising," Knudson was actually watching and observing the way Turek flew the Cessna 421B, all part of the process of considering Turek to become a new partner in the airplane. Levinson would explain that his concern was the manner in which Turek handled the controls such that he not handle the controls in a way that might

harm the engine. The FAA records would also show that Turek was the pilot in command. Plaintiff is unable to present any information to show that Knudson was in fact supervising Turek's actual flying of the airplane, nor that Knudson should have done so.[14] Because Knudson had no duty to supervise Turek during the flight, Knudson cannot be held liable for negligently supervising Turek.

¶ 82 Moreover, even if Knudson were voluntarily supervising Turek, nobody can know what happened in the airplane that night. The airplane wreckage was such that it is unknown where in the plane Knudson was sitting, let alone whether he was actively supervising Turek. The flight plan and all in-flight transmissions contained in the record fail to show whether Knudson was supervising Turek. There is, simply, nothing to show (1) that Knudson voluntarily undertook to supervise Turek on this flight; (2) that he had the duty to do so; or (3) that he failed in his duty to do so. Accordingly, the trial court's granting of the motion to dismiss as to the negligent supervision count is affirmed.

¶ 83                           3. Piercing the Corporate Veil

¶ 84 Plaintiff also contends that the corporate veil doctrine does not support dismissal of this case. Plaintiff argues that, "where Knudson actively participated in negligent conduct, his status as a shareholder of HK Golden Eagle does not insulate him from liability." The estate of Knudson did not respond to this argument. A reviewing court is entitled to have the issues on appeal clearly defined with pertinent authorities cited and a cohesive legal argument presented. *Thrall Car Manufacturing Co.*, 145 Ill. App. 3d at 719. Illinois Supreme Court Rule 341(h)(7) (eff. Feb. 6, 2013) provides: "Points not argued are waived and shall not be raised in the reply brief, in oral argument, or on petition for rehearing." This rule applies to appellees as well as appellants. *Vancura*, 238 Ill. 2d at 372. Accordingly, the estate of Knudson has waived this issue and we will not address it here.

¶ 85                                    E. Sybaris
¶ 86                              1. Vicarious Liability

¶ 87 Plaintiff contends the trial court erred in granting the motion to dismiss pursuant to section 2-619 of the code where Knudson, who was Sybaris's employee and agent, was acting in that capacity and in furtherance of the business of Sybaris during the fatal flight. While so acting, alleges plaintiff, Knudson was negligent in both his supervision of Turek and in his entrustment of the airplane to Turek. Plaintiff maintains that, as a matter of law, Sybaris is vicariously liable for the actions of Knudson. Sybaris, on the other hand, responds that it is not, as a matter of law, vicariously liable for the actions of Knudson when the flight in question was taken for a dual purpose rather than solely for a business purpose, and that his activities in connection with this flight were too remotely related to Sybaris business to impose liability upon it.

---

[14]Although plaintiff urges this court to find that, "as the owner of the aircraft and the more experienced pilot, Knudson had the ultimate control and responsibility for ensuring the safety of the flight," plaintiff does not direct this court to any precedent to support this argument, but merely cites to her own experts, who opined that this was Knudson's responsibility.

¶ 88        Under the theory of *respondeat superior*, "an employer can be liable for the torts of his employee when those torts are committed within the scope of the employment." *Adames v. Sheahan*, 233 Ill. 2d 276, 298 (2009). Moreover, an employer's vicarious liability extends to the negligent, willful, malicious, or even criminal acts of its employees when those acts are committed within the scope of employment. *Adames*, 233 Ill. 2d at 298. "In the context of *respondeat superior* liability, the term 'scope of employment' excludes conduct by an employee that is solely for the benefit of the employee." *Deloney v. Board of Education*, 281 Ill. App. 3d 775, 784 (1996).

> "[U]nder the doctrine of *respondeat superior*, an employer can be held vicariously liable for the tortious acts of its employees [citation], including negligent, wilful, malicious, or even criminal acts of its employees when such acts are committed in the course of employment and in furtherance of the business of the employer [citation]. 'Whether or not the employee's act is intentional or merely negligent is not the defining factor. Instead, the focus is on whether or not the act was performed within the "scope of employment." ' [Citation.] ***
>
> The term 'scope of employment' had not been precisely defined, but Illinois uses the following criteria in determining whether an act is within the scope of employment:
>
> > ' "(1) Conduct of a servant is within the scope of employment if, but only if:
> >
> > > (a) it is of the kind he is employed to perform;
> > >
> > > (b) it occurs substantially within the authorized time and space limits;
> > >
> > > (c) it is actuated, at least in part, by a purpose to serve the master ***[.] ***
> >
> > (2) Conduct of a servant is not within the scope of employment if it is different in kind from that authorized, far beyond the authorized time or space limits, or too little actuated by a purpose to serve the master." ' *Pyne* [*v. Witmer*, 129 Ill. 2d 351, 359-60 (1989)], quoting Restatement (Second) of Agency § 228 (1958)." *Davila v. Yellow Cab Co*., 333 Ill. App. 3d 592, 600 (2002).

¶ 89        To determine whether an employee is serving his employer's purpose, we use the "frolic vs. detour" analysis. *Rodman v. CSX Intermodal, Inc*., 405 Ill. App. 3d 332, 338 (2010). " 'A detour occurs where the employee's deviation for personal reasons is seen as sufficiently related to the employment.' [Citation.] In contrast, '[a] frolic occurs where the employee's personal business is seen as unrelated to employment.' [Citation.] " *Rodman*, 405 Ill. App. 3d at 338.

¶ 90        Under the dual-purpose theory, which generally arises in the context of workers' compensation and coverage, " 'when a trip serves both business and personal purposes, it is a personal trip if the trip would have been made in spite of the failure or absence of the business purpose and would have been dropped in the event of failure of the private purpose, though the business errand remained undone; it is a business trip if a trip of this kind would have been made in spite of the failure or absence of the private purpose, because the service to be performed for the employer would have caused the journey to be made by someone even if it had not coincided with the employee's personal journey.' (1 A. Larson, Workmen's Compensation sec. 18.12, at 4-218 (1978), citing, at 4-221, *Boyer Chemical Laboratory Co.*

*v. Industrial Com.* (1937), 366 Ill. 635, 641, and *Irwin-Neisler & Co. v. Industrial Com.* (1931), 346 Ill. 89, 94-95.)" *Gmelich v. Industrial Comm'n*, 81 Ill. 2d 44, 48 (1980).

¶ 91     Here, Sybaris urges us to find there was no error in this dismissal, as, according to Sybaris, it is not liable under the dual purpose theory because Knudson would have gone to Kansas with Turek whether he had Sybaris business to attend to or not. It also argues that there is no liability under a *respondeat superior* theory because: (1) Knudson's alleged tortious conduct was not actuated, even in part, by a purpose to serve Sybaris ("Sybaris is solely in the business of hotel ownership and operation. Observing the in-flight skills of a pilot is clearly outside the scope of hotel ownership and management."); and (2) even assuming Knudson's conduct was actuated in part by a purpose to serve Sybaris, any such conduct was too little actuated by such purpose. Plaintiff, on the other hand, argues that this is a question of fact, precluding a motion to dismiss, which should be presented to the trier of fact. We agree with plaintiff, and take note:

> "Whether the employee's conduct was so unreasonable as to make his act an independent act of his own, rather than a mere detour or one incidental to employment, is a question of degree which depends upon the facts of the case. [Citation.] It is therefore axiomatic that this question should be decided by a jury ' "unless the deviation is so great, or the conduct so extreme, as to take the servant outside the scope of his employment and make his conduct a complete departure from the business of the [Citation.] master." ' [Citation.]" *Rodman*, 405 Ill. App. 3d at 338.

¶ 92     Here, the record shows that Knudson was the founder and president of Sybaris. Sybaris is in the hotel business and has a number of hotels in the Midwest. The accident aircraft had recently been purchased from Sybaris. On the day of the accident, the four men on the aircraft had overlapping reasons for going to Kansas together. Turek, Garland, and Waugh met with a prospective Morgan Stanley client in Kansas; Knudson met with McGuinn regarding a new hotel location; Turek was interested in becoming a partner in the Cessna 421B, and Knudson was observing his flying of the aircraft. According to Randell Repke, who at the time of the accident was the vice president of Sybaris, Knudson often flew private aircraft on Sybaris business to visit hotel locations. He explained that, regarding the time period when Sybaris owned the Cessna 421B, Sybaris had purchased the aircraft because "[i]t was anticipated in our growth, and we were having, you know, and expansion program in place that we had anticipated at the very minimum that [Knudson] could use to go to some of the outer properties in Indiana and Wisconsin, and as we expanded, if there was other cities and states that we needed to go to, he would have the ability to do that. Be much more convenient to use your own aircraft than to try to make arrangements for commercial flights."

¶ 93     William McGuinn, Knudson's business associate, testified that Knudson met with him in Kansas on the day of the airplane crash. They drove together to a property approximately 30 minutes away that McGuinn thought would make a good hotel property. McGuinn testified that Knudson had been looking for a property near Kansas City to develop into a hotel for some time. Knudson and McGuinn then went to lunch, where they continued to talk about Sybaris business. McGuinn also testified, however, that the January visit was less planned than usual. He testified that, generally, Knudson would come to town and McGuinn would pick him up at the airport and drive around looking for properties with another agent. This time, however, Knudson contacted him a few days before the visit, expressing that he wanted

to see the possible hotel site, but explaining he was not sure if he would have time to do so. He told him he had some business to do in Kansas City and, if time permitted, he would like to see the potential property. Time did permit, and they did see the property together.

¶ 94 We think this factual scenario is not appropriate for a motion to dismiss. Construing all evidence and reasonable inferences in plaintiff's favor, as we must on a motion to dismiss, whether and to what extent Knudson was traveling on Sybaris business remains a question of fact, which should be presented to the trier of fact. Vicarious liability against Sybaris for Knudson's negligence is sufficiently alleged to defeat a motion to dismiss.

¶ 95                                    2. *De Facto* Ownership

¶ 96 Plaintiff next contends the trial court erred in granting the motion to dismiss pursuant to section 2-619 of the Code where, although it no longer held title to the accident aircraft, it remained a *de facto* owner of the plane through Knudson's control. Plaintiff argues, "[g]iven this '*de facto*' ownership of the plane, Sybaris had a duty to insure a safe, operable flight to and from Kansas City on the day of the occurrence." We disagree.

¶ 97 Plaintiff cites to four cases to support her position that, although Sybaris no longer held title to the accident aircraft, it was a *de facto* owner and somehow responsible for the way in which the aircraft was flown. First, she cites to *Steel Co. v. Morgan Marshall Industries, Inc.*, 278 Ill. App. 3d 241 (1996), and *Green v. Firestone Tire & Rubber Co.*, 122 Ill. App. 3d 204 (1984). Both of these cases are inapposite, as they deal with *de facto* mergers involving continuity of management, personnel, physical location, assets, and general business operations or continuity of shareholders or an exchange of stock. Plaintiff's two personal property cases are also unhelpful to her cause. First, she cites to *Caldbeck v. Chicago Park District*, 97 Ill. App. 3d 452 (1981). In that case, this court held that a boat owner had made a *de facto* assignment of his harbor mooring permit in violation of the Chicago park district rules governing assignment of such permits. *Caldbeck*, 97 Ill. App. 3d at 459. The other case, *People v. Dugan*, 109 Ill. 2d 9 (1985), deals with our supreme court's holding construing the statute governing an owner's right to contest the forfeiture of a vessel, vehicle, or aircraft used in the commission of a criminal offense. *Dugan*, 109 Ill. 2d at 18. These cases, too, are inapposite to the case at bar.

¶ 98 Plaintiff attempts to stretch the theories espoused in these cases to encompass airplanes that have legally changed owners and to, inexplicably and without further citation to authority, require these previous and now *de facto* owners to be responsible for aircraft that is no longer theirs. Where there is no support for this in the case law, plaintiff is unable to withstand a motion to dismiss pursuant to section 2-619 of the Code, and we find no error in the trial court's dismissal of this issue.

¶ 99                                    F. HK Golden Eagle

¶ 100 Plaintiff also contends the trial court erred in granting HK Golden Eagle's motion to dismiss pursuant to section 2-619 of the Code, where HK Golden Eagle was vicariously liable for the actions of Levinson and Knudson. The trial court, granting the motion to dismiss as to Levinson and Knudson after finding no evidence to support a claim for negligent entrustment against either Levinson or Knudson, nor support for a claim of negligent supervision against Knudson, also granted the motion to dismiss in favor of HK

Golden Eagle to which, it was alleged, liability for the actions of Levinson and Knudson would flow vicariously. On appeal, plaintiff argues, again, that "HK, through its officers and agents, Levinson and Knudson, breached its duty to ensure that Turek was a qualified, current and proficient pilot before allowing him to fly the Cessna 421B. The facts of this case show that HK knew or could have known by the exercise of due diligence, that Turek was not legally qualified to function as the Pilot in Command. More than sufficient facts show that not only was Turek inexperienced flying a Cessna 421B in these conditions, but Turek's piloting capabilities were critiqued in various ways by Knudson and Levinson prior to the subject flight. Therefore, it is apparent that HK, through Knudson and Levinson, was negligent when it allowed Turek to pilot this flight, and such negligence resulted in the deaths of all its passengers, Garland included. HK's right to judgment as a matter of law, after drawing all inferences in favor of the Plaintiff, is not clear and free from doubt, and should now be reversed."

¶ 101    HK Golden Eagle fails to respond to plaintiff's contention that it should be held vicariously liable for its officers' and agents' negligence, but instead spends the entirety of its brief arguing that the trial court did not err in dismissing the claim because Levinson and Knudson are not liable in this crash. At the time the trial court dismissed this claim regarding vicarious liability, it had dismissed the claims as to Levinson and Knudson. Now, however, we have found that the question of negligent entrustment by both Levinson and Knudson withstands the motions to dismiss. A reviewing court is entitled to have the issues on appeal clearly defined with pertinent authorities cited and a cohesive legal argument presented. *Thrall Car Manufacturing Co.*, 145 Ill. App. 3d at 719. Illinois Supreme Court Rule 341(h)(7) (eff. Feb. 6, 2013) provides: "Points not argued are waived and shall not be raised in the reply brief, in oral argument, or on petition for rehearing." This rule applies to appellees as well as appellants. *Vancura*, 238 Ill. 2d at 372. Accordingly, HK Golden Eagle has waived this issue. Plaintiff's contentions, without benefit of counterargument from HK Golden Eagle, that HK Golden Eagle is vicariously liable for the actions of Levinson and Knudson, are sufficient to withstand a motion to dismiss.

¶ 102                                    III. CONCLUSION

¶ 103    For all of the foregoing reasons, we reverse the decision of the circuit court as to negligent entrustment by the Levinson defendants, negligent entrustment by Knudson, vicarious liability as to Sybaris regarding the issue of negligent entrustment, and vicarious liability as to HK Golden Eagle regarding the issue of negligent entrustment. We affirm the decision of the circuit court in all other respects.

¶ 104    Affirmed in part and reversed in part.